THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARIOUS M. BOWENS, Defendant-Appellant.

Fourth District   No. 4—09—0462

Opinion filed February 23, 2011.

Michael J. Pelletier, Karen Munoz, and Colleen Morgan, all of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Brown, State's Attorney, of Pontiac (Patrick Delfino, Robert J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justice Myerscough concurred with the judgment and opinion.

Justice Pope dissented, with opinion.

## OPINION

Defendant, Darious M. Bowens, admitted at his January 2009 trial that he stabbed his girlfriend, Belinda Butler, 23 times in her chest, back, and arms. Despite this admission, he denied that he intended to kill her. Apparently unpersuaded, a jury convicted defendant of attempt (first degree murder) (720 ILCS 5/8—4, 9—1(a)(1) (West 2008)), aggravated domestic battery (720 ILCS 5/12—3.3 (West 2008)), and two counts of aggravated battery (720 ILCS 5/12—3 (West 2008)). The trial court later sentenced him to 24 years in prison.

Defendant appeals, arguing that he was denied a fair trial. Specifically, defendant contends that the trial court erred by failing to (1) excuse the trial judge's husband from the jury for cause; (2) comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); (3) allow him to impeach Butler with evidence of her prior felony conviction; (4) restrict the State from introducing a knife that was unconnected to him or the crime; (5) bar the State's lead investigator from sitting at the State's counsel table throughout the case; and (6) grant his motion to refer to Butler's alcohol consumption during closing arguments. As part of his argument, defendant contends that the cumulative effect of these errors justifies a new trial.

Defendant also appeals his sentence, arguing that the trial court improperly increased his prison sentence from 20 years to 24 years. Because we conclude that (1) defendant received a fair trial and (2) the court did not increase his sentence, we affirm.

## I. BACKGROUND

### A. The State's Charges and Defendant's Trial Strategy

In February 2008, the State charged defendant with (1) attempt (first degree murder) (720 ILCS 5/8—4, 9—1(a)(1) (West 2008)), (2) aggravated domestic battery (720 ILCS 5/12—3.3 (West 2008)), and (3) two counts of aggravated battery (720 ILCS 5/12—3 (West 2008)), alleging that defendant repeatedly stabbed Butler, intending to kill her.

Before discussing the evidence presented at defendant's January 2009 trial, we note that this case is rather unusual, given that defendant disputes almost none of the State's evidence. Instead,

defendant's trial strategy—which defense counsel explained during his opening statement—was only to convince the jury that the State failed to show that defendant had the requisite intent to kill Butler.

## B. The Evidence Presented at Defendant's Trial

Butler testified that she and defendant were preparing dinner at her apartment. While their dinner was in the oven, the couple sat on the couch, talking and watching television. As Butler was finishing her second beer, defendant asked her whether they were going to have sex. Butler responded, "No." Defendant asked her whether she was still attracted to him, but Butler did not respond. Defendant then sat up on the edge of the couch, shook his head and said, "I'm sorry. I've got to do this." Butler asked defendant whether she should be scared and he responded, "Yes."

Butler told defendant that she was going to call the police and reached for her cellular telephone. Before she could get to her phone, however, defendant was on top of her, stabbing her in the chest with a knife. Butler tried to get away, pleading for defendant to stop. Defendant stabbed Butler repeatedly in the chest, back, and arms. Suddenly, defendant stopped stabbing Butler, threw the knife into the hallway, and said, "I've got to get the fuck out of here." Defendant took Butler's cellular telephone and left.

Butler dragged herself next door to Gerry Gilmor's apartment. She banged on the door and pleaded, "Gerry, help me. He stabbed me. Please don't let me die."

Gilmor testified that she heard (1) pounding on the wall that she shared with Butler and (2) Butler yelling defendant's name. Shortly thereafter, Gilmor heard Butler at her kitchen door, pleading, "Miss Gerry, Miss Gerry, please don't let me die." Gilmor rushed outside to find Butler sprawled half-on and half-off her porch. Gilmor called 9-1-1 and tried to stop the bleeding.

Responding officers testified that Butler was conscious when they arrived. Butler told one officer, "[H]e stabbed me. Please don't let me die." Officers searched Butler's apartment and found (1) a wooden-handled steak knife with a bent blade in the hallway; (2) blood on the walls, kitchen floor, carpet, and couch; and (3) defendant's bloodstained fingerprint on Butler's doorknob.

A 9-1-1 dispatcher testified that she received the emergency call from Gilmor. While she was on the phone with Gilmor, her fellow dispatcher received a call from defendant, who was distraught and crying. Defendant admitted doing something "really bad" and then threatened to kill himself.

Defendant's sister testified that defendant came to the house that she shared with defendant's mother, banging on the door and crying. Once inside, defendant admitted stabbing Butler. Shortly thereafter, defendant used the bathroom to wash Butler's blood from his arms.

Police arrived at defendant's mother's house to find defendant standing in the kitchen, crying and repeatedly telling them, "Just kill me. Just shoot me." Defendant's mother was able to assist officers in arresting her son. Upon his arrest, officers discovered that defendant's shoes and jeans were blood-stained.

The paramedic who responded to the 9-1-1 call testified that Butler had multiple wounds and lacerations. She had lost a lot of blood and was having difficulty breathing. The paramedic explained that when he arrived at Gilmor's apartment, the injuries were so serious that it was "just one of those [situations] where you just kind of say, [']oh, crap['] *** and you *** immediately start addressing the issues at hand." Butler almost lost consciousness at least twice on the way to the hospital.

Butler's emergency-room doctor testified that she appeared to be "critically ill" when she arrived. She was not communicating well and had stab wounds to her torso, arms, armpits, wrists, and back, some of which caused hemorrhages. Those wounds included three stab wounds to the "black box," a term he used to describe the critical area of the back and chest surrounding the heart. Butler was eventually transported by helicopter to a trauma center for additional medical care.

## C. The Jury's Verdict and Defendant's Sentence

On this evidence, the jury convicted defendant of attempt (first degree murder) (720 ILCS 5/8—4, 9—1(a)(1) (West 2008)), aggravated domestic battery (720 ILCS 5/12—3.3 (West 2008)), and two counts of aggravated battery (720 ILCS 5/12—3 (West 2008)). The trial court later sentenced defendant to 24 years in prison.

This appeal followed.

## II. DEFENDANT'S CLAIM THAT HE DID NOT RECEIVE A FAIR TRIAL

Defendant argues that he was denied a fair trial. Specifically, defendant contends that the trial court erred by failing to (1) excuse the trial judge's husband from the jury for cause; (2) comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); (3) allow him to impeach Butler with evidence of her prior felony conviction; (4) restrict the State from introducing a knife that was unconnected to him or the crime; (5) bar the State's lead investigator from sitting at the State's counsel table throughout the case; and (6) grant his motion to refer to

Butler's alcohol consumption during closing arguments. As part of his argument, defendant contends that the cumulative effect of these errors justifies a new trial. We address defendant's contentions in turn.

## A. Defendant's Contention That the Trial Court Erred by Failing To Excuse the Trial Judge's Husband From the Jury for Cause

Defendant contends that the trial court erred by failing to excuse the trial judge's husband from the jury for cause. Specifically, defendant asserts that the court erroneously allowed her husband, Scott Bauknecht, to serve on the jury. For the reasons that follow, we conclude that defendant has waived this contention.

### 1. *Waiver and Forfeiture*

Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. *People v. Phipps*, 238 Ill. 2d 54, 62, 933 N.E.2d 1186, 1191 (2010); *Gallagher v. Lenart*, 226 Ill. 2d 208, 229, 874 N.E.2d 43, 56 (2007). In the course of representing their clients, trial attorneys may (1) make a tactical decision not to object to otherwise objectionable matters, which thereby waives appeal of such matters, or (2) fail to recognize the objectionable nature of the matter at issue, which results in procedural forfeiture. *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 898, 931 N.E.2d 246, 253 (2010) (holding that a challenge to the opponent's opening statement had not been preserved, with Justice Appleton noting in a special concurrence that defense counsel made a *tactical* decision not to object, which "[did] not excuse the requirement to do so if the error [was] to be preserved for review" (*Lovell*, 397 Ill. App. 3d at 902, 931 N.E.2d at 256 (Appleton, J., specially concurring))).

### 2. *Challenges for Cause and Peremptory Challenges*

Prospective jurors may be challenged in two ways: (1) for cause or (2) peremptorily. A challenge for cause is a "challenge supported by a specified reason, such as bias or prejudice, that would disqualify that potential juror." Black's Law Dictionary 245 (8th ed. 2004). A peremptory challenge, on the other hand, is "[o]ne of a party's limited number of challenges that do not need to be supported by a reason." Black's Law Dictionary 245 (8th ed. 2004) (noting that "a party may not use such a challenge in a way that discriminates against a protected minority"). Challenges for cause are limitless (see Ill. S. Ct. R. 434(c) (eff. May 1, 1985)) and are left to the discretion of the trial court (*People v. Ramsey*, 239 Ill. 2d 342, 419 (2010)). In contrast, peremptory challenges are limited by Supreme Court Rule 434(d), which allows defendants in a criminal case facing imprisonment seven such challenges. Ill. S. Ct. R. 434(d) (eff. May 1, 1985).

### 3. *The Pertinent Challenges in This Case*

Following *voir dire* questioning by the trial court and counsel, the court allowed counsel to strike jurors only within each respective panel of four. Defense counsel exercised four peremptory challenges (potential jurors 70, 10, 66, and 141) before accepting the first panel. During the selection of the second panel, the following exchange occurred regarding prospective juror Bauknecht:

"[DEFENSE COUNSEL]: Judge, I'm going to make a motion for cause on number 7, Bauknecht. I just, I don't have any legitimate legal basis. I don't know the research on this, but it just seems strange enough.

THE COURT: I don't think I can excuse him for cause. I will let you know for the record that we typically don't discuss much about work with each other, and I have gone to great lengths to not discuss anything about this case knowing that he was on upcoming jury duty.

[DEFENSE COUNSEL]: I make the motion for cause. I don't have an argument on it.

THE COURT: I don't think I can excuse him for cause. I don't have a basis for cause. That's denied.

[DEFENSE COUNSEL]: Okay. Judge, I'm going to pause for a second here, please."

Shortly thereafter, defense counsel used his fifth peremptory challenge (potential juror 126). The defense then accepted that panel, which included juror Bauknecht. We note that when defendant accepted this second panel, he still possessed two unexercised peremptory challenges. Later, the defense exercised those last two peremptory challenges (jurors 78 and 149) during the selection of the final panel. In total, defendant exercised (1) four of his peremptory challenges before accepting the first panel of four jurors; (2) one peremptory challenge before accepting the second panel of four jurors, which included juror Bauknecht; and (3) two peremptory challenges before accepting the final panel of four jurors.

### 4. *The Alleged Error in This Case*

Defendant claims that the trial court erred by failing to grant his motion to remove juror Bauknecht for cause. As part of his claim, defendant posits that he did not exercise one of his two remaining peremptory challenges to remove juror Bauknecht because he had already allocated those challenges to remove other prospective jurors. As previously indicated, we conclude that defendant has waived his challenge in this regard.

### a. The Application of Waiver to This Case

This court has repeatedly stated that "we will review the trial court's ruling on a challenge for cause only when an objectionable

juror was forced upon a party *after* it had exhausted its peremptory challenges." (Emphasis added.) *Grady v. Marchini*, 375 Ill. App. 3d 174, 179, 874 N.E.2d 179, 184 (2007) (citing *Flynn v. Edmonds*, 236 Ill. App. 3d 770, 779, 602 N.E.2d 880, 885 (1992)). See *People v. Green*, 199 Ill. App. 3d 927, 931, 557 N.E.2d 939, 942 (1990) (holding that the defendant was precluded from asserting error where the defendant had used all of his peremptory challenges and did not ask for more).

Here, defendant challenged juror Bauknecht for cause. When the trial court denied his challenge, defendant did not exercise one of his then-remaining three peremptories to exclude juror Bauknecht. Instead, he peremptorily excused a different prospective juror from that panel and passed the remaining panel, including juror Bauknecht, to the State.

Had defendant used a peremptory challenge for juror Bauknecht and later exhausted all of his peremptory challenges, he could have requested—if necessary—additional peremptory challenges, a request the trial court could have granted at its discretion. Indeed, defendant not only failed to exercise a peremptory challenge to remove juror Bauknecht, he affirmatively accepted the panel upon which juror Bauknecht sat.

Regarding prospective jurors 126, 78, and 149, who were the first three jurors for whom defendant exercised peremptory challenges, we note that defendant did so without first challenging any of them for cause. He challenged juror Bauknecht for cause, but when the trial court denied that challenge, defendant did not use a peremptory challenge to excuse him. Defendant's actions in this regard demonstrate that in his view—at least for purposes of a fair trial—those prospective jurors were not as "bad" as juror Bauknecht. Otherwise, defendant would also have first challenged them for cause.

If defendant believed that a fair trial required juror Bauknecht to be excluded, he should have removed him from the second panel of prospective jurors with one of his remaining peremptory challenges. After all, this record clearly shows that defense counsel understood both the availability of defendant's peremptory challenges and how to use them. These circumstances compel the conclusion that defendant's decision not to peremptorily remove juror Bauknecht was an affirmative acquiescence to Bauknecht's jury service, which thereby constitutes a waiver of this issue on appeal. See *People v. Hill*, 353 Ill. App. 3d 961, 966-67, 819 N.E.2d 1285, 1290 (2004) (holding that the defendant's acquiescence to a mistrial constituted implicit consent, precluding a later claim of double jeopardy).

A possible explanation for defense counsel's failure to use a peremptory challenge to remove juror Bauknecht might be counsel's

attempt to plant a seed of error, the fruit from which defendant is now trying to harvest on appeal. However, the law does not permit a party to intentionally fail to avail himself of the resources provided (in this case, peremptory challenges), only to complain about the result on appeal. See *United States v. Boyd*, 86 F.3d 719, 721-22 (7th Cir. 1996) ("Many a defendant would like to plant an error and grow a risk-free trial ***. But steps the court takes at the defendant's behest are not reversible, because they are not error ***.''). This is not unlike the situation where a deliberating jury sends a note to the trial court and defense counsel does not object to the court's inappropriate response. Such inaction bars the defendant from complaining about that response on appeal. See *Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 63-64, 707 N.E.2d 695, 699 (1999) (concluding that counsel's acquiescence to the court's response to a note from the jury constituted waiver).

### b. The Alleged Application of Plain Error to This Case

We note that despite defendant's insistence, plain-error analysis does not apply to this case. Plain-error analysis applies to cases involving procedural default (*People v. Ahlers*, 402 Ill. App. 3d 726, 733-34, 931 N.E.2d 1249, 1255 (2010)), not affirmative acquiescence (see *People v. Townsell*, 209 Ill. 2d 543, 547-48, 809 N.E.2d 103, 105 (2004)). In a situation like this, where defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack. (We note that defendant is not contending in this appeal that counsel was ineffective.)

### c. The Alleged Application of Structural Error in This Case

We likewise reject any notion that juror Bauknecht's jury service somehow constitutes structural error. In so doing, we reiterate our conclusion that no error occurred in this case, given that defendant affirmatively acquiesced to juror Bauknecht's service on his jury. See *Boyd*, 86 F.3d at 722 ("[the] steps the court takes at the defendant's behest are not reversible, because they are not error"). However, even if defendant had not affirmatively acquiesced to juror Bauknecht's service, that service—if error at all—would not have been structural error on the facts of this case.

An error is structural when it "renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence." *People v. Averett*, 237 Ill. 2d 1, 12-13, 927 N.E.2d 1191, 1198 (2010). We acknowledge that the supreme court has determined that "a trial before a biased tribunal would constitute structural error." *People v. Glasper*, 234 Ill. 2d 173, 200, 917 N.E.2d 401, 418 (2009) (citing *People*

*v. Rivera,* 227 Ill. 2d 1, 19-20, 879 N.E.2d 876, 887 (2007)). However, a defendant must demonstrate that such bias actually existed. See *Averett,* 237 Ill. 2d at 12-13, 927 N.E.2d at 1198 (noting that structural error rarely occurs and has been found where, among other very limited circumstances, a defendant is tried before a biased judge).

Here, defendant has failed to assert actual bias, merely the appearance of such bias. Indeed, defendant acknowledges on appeal that (1) "defense counsel did not allege that there existed any actual bias, but nevertheless, the presence of the judge's spouse on the jury created an *appearance* of impropriety that should have been remedied" and (2) "the trial judge seating her husband on the jury created an inexcusable *appearance* of judicial bias." (Emphases in original.)

On this record, we decline to address whether jury service by a trial judge's spouse in a case in which (1) that judge presides and (2) defendant has not acquiesced in that service, might constitute *per se* reversible trial error. (We note, however, that the record contains no suggestion of some compelling need for why the trial court thought it necessary for her spouse to serve as a juror in a case over which she presided, a circumstance that strikes this court as rather unusual.)

## B. Defendant's Contention That the Trial Court Erred by Failing To Comply With Rule 431(b)

Defendant next contends that the trial court erred by failing to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For the reasons that follow, we conclude that defendant has forfeited review of this issue.

### 1. *The Pertinent Portion of the Voir Dire in This Case*

On the morning of *voir dire,* the trial court brought all 32 prospective jurors into the courtroom. After describing to the prospective jurors the charges that defendant was facing, the court explained the following principles of law:

"As you will recall, probably all of you have heard this at least once last week, since this is a criminal trial, there are certain propositions of law that you must be willing to follow. Please listen carefully to those propositions as we will be asking each of you if you understand and accept these propositions.

The presumption of innocence stays with *** [d]efendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved *** [d]efendant's guilt beyond a reasonable doubt. The State has the burden of proving *** [d]efendant's guilt beyond a reasonable doubt. *** Defendant does not have to prove his innocence. *** Defendant does not have to present any evidence on his own behalf and does not have to testify

if he does not wish to. And if *** [d]efendant does not testify, that fact must not be considered by you in any way in arriving at your verdict."

The court next proceeded to name each of the potential witnesses in the case and explain to the potential jurors that they had a duty not to read or listen to any press reports about the case. The court thereafter called the first 16 potential jurors for questioning.

After asking a series of questions of those potential jurors regarding their knowledge of the case, the court further questioned them as follows:

"THE COURT: *** A few minutes ago, [the court] recited the basic principles of law in a criminal case. Do all of you recall the principles of law that [the court] stated a few minutes ago?

POTENTIAL JURORS: (Nod heads.)

THE COURT: Everybody's indicating yes. Do each of you understand and accept those principles of law? If not, please raise your hand if there's any confusion or concern.

POTENTIAL JURORS: (No response.)

THE COURT: Nobody's raising their hand. Do each of you believe you can give both sides a fair trial in this case?

POTENTIAL JURORS: (Nod heads.)

THE COURT: If not, please raise your hand.

POTENTIAL JURORS: (No response.)"

Counsel and the trial court then proceeded to conduct further *voir dire* of those 16 potential jurors.

Following *voir dire* of those 16 potential jurors, the trial court began questioning the remaining 16 potential jurors. After asking several questions of those 16 potential jurors regarding their knowledge of the case, the court further inquired of them, as follows:

"THE COURT: Okay. Now [the court] did recite earlier this morning the principles of law that you must be willing to follow and accept in this case. Does everyone recall those principles of law? *** Defendant is presumed innocent. The State has the burden of proof. Everybody's acknowledging that. Do each of you understand and accept those principles of law? If not, please raise your hand.

POTENTIAL JURORS: (Nod heads.)

THE COURT: I'm getting a lot of nods in agreement so that's good. Do each of you believe you can give both sides a fair trial? If not, please raise your hand.

POTENTIAL JURORS: (Nod heads.)

THE COURT: [The court is] getting a lot of nods on that question as well."

The defense did not object to this method of complying with Rule 431(b)'s mandate.

## 2. The Alleged Error in This Case

Although defendant concedes that he has forfeited his contention, he nonetheless asserts that the trial court committed plain error when it did not comply with Rule 431(b)'s mandates because the court's "after-the-fact, vague reference to th[o]se important concepts" when it asked whether the jury understood and accepted those concepts was insufficient to comply with the rule's mandate. Essentially, defendant posits that too large a gap in time existed between the court's reading of the Rule 431(b) concepts and the court's asking the prospective jurors whether they understood and accepted those concepts. We disagree.

Before deciding whether the trial court committed plain error, we will first determine whether error occurred at all—that is, we will decide whether the trial court violated Rule 431(b)'s mandates. See *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403 (2010) (reviewing the trial court's Rule 431(b) admonishments to determine whether error occurred at all before conducting its plain-error analysis). This requires us to construe Rule 431(b). *Thompson*, 238 Ill. 2d at 606. In other words, we must decide what Rule 431(b) requires.

When the language of a supreme court rule is clear and unambiguous, a reviewing court must apply that rule as written without resort to aids of construction. *Thompson*, 238 Ill. 2d at 606. We review *de novo* the proper interpretation of supreme court rules. *Thompson*, 238 Ill. 2d at 606.

Rule 431(b) requires that trial courts read certain principles of law to the jury and determine whether each juror understands and accepts those principles, as follows:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted[,] the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Our supreme court recently had occasion to interpret Rule 431(b). The supreme court's interpretation of that language was as follows:

"Rule 431(b) *** mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his or her understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607.

In this case, the trial court fully complied with this mandate when it presented specific questions to which it received group responses. Specifically, the court (1) methodically explained each of the Rule 431(b) principles, which included the preamble that they should "listen carefully" to those principles because the court would later be asking them whether they "understood and accepted" those principles and, shortly thereafter, (2) asked each of the prospective jurors whether they indeed understood and accepted those principles, to which the court received affirmative group responses. The fact that the court did not ask those jurors whether they understood and accepted those principles immediately following its explanation of those principles does not constitute a violation of Rule 431(b) on the facts of this case.

This case is distinguishable in that regard from our recent decision in *People v. Wrencher*, 399 Ill. App. 3d 1136, 1144-45, 929 N.E.2d 1124, 1131-32 (2009), where this court concluded that error occurred when the trial court, during its *voir dire* questioning, explained the Rule 431(b) principles but did not ask the jurors whether they understood and accepted those principles until a significant time later (89 pages of transcript later, plus a 15-minute recess). Here, the record shows that the court directed the attention of both 16-member panels back to the Rule 431(b) principles it had recently explained before asking them whether they "understood and accepted" those principles (9 pages of transcript with no recess for the first panel of 16 prospective jurors, and 41 pages of transcript with no recess for the second panel of 16 prospective jurors). The record further shows that those panels understood the court's reference and responded affirmatively to the court's inquiries.

Accordingly, we conclude that although a better practice would be for the trial court to ask prospective jurors whether they understand and accept the Rule 431(b) principles immediately (or close thereto) following its explanation of those principles, the court fully complied with Rule 431(b)'s mandate on the facts of this case. Because no error occurred, let alone plain error, we honor defendant's procedural default. See *People v. Naylor*, 229 Ill. 2d 584, 593, 893 N.E.2d 653, 659-60 (2008) (procedural default must be honored when a defendant fails to establish plain error).

## C. Defendant's Contention That the Trial Court Erred by Not Allowing Him To Impeach Butler With Evidence of Her Prior Felony Conviction

Defendant next contends that the trial court erred by not allowing him to impeach Butler with evidence of her prior felony conviction. Specifically, defendant asserts that the court's failure to allow him to impeach Butler with her previous domestic-battery conviction violated his constitutional right to confrontation, rendering his trial unfair (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8). As part of his argument, defendant posits that when a defendant is on trial, the court must be concerned about the danger of unfair prejudice related to the use of that defendant's previous convictions on cross-examination (*People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971)), but when it is the State's witness, those concerns are substantially mitigated. Defendant's points are well taken. However, given the unique nature of this case, even if the court's failure to allow defendant to impeach Butler with her previous domestic battery conviction was erroneous and of a constitutional dimension, that error was harmless beyond a reasonable doubt.

In this context, an error is harmless when "it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *People v. Stechly*, 225 Ill. 2d 246, 304, 870 N.E.2d 333, 367 (2007). To determine whether an error meets this standard, the reviewing court must consider, in pertinent part, the following: (1) whether the error " 'might have contributed to the conviction' "; and (2) whether the other evidence in support of the conviction is " 'overwhelming.' " *Stechly*, 225 Ill. 2d at 304-05, 870 N.E.2d at 367-68 (quoting *People v. Patterson*, 217 Ill. 2d 407, 428, 841 N.E.2d 889, 902 (2005), citing *People v. Wilkerson*, 87 Ill. 2d 151, 157, 429 N.E.2d 526, 528 (1981)).

In this case, defendant claims that he should not have been barred from presenting to the jurors Butler's previous conviction for domestic battery, which he posits would raise substantial doubt about her credibility in their minds. However, we conclude beyond a reasonable doubt that such an error, if error at all, could not have contributed to the jury's verdict in this case.

First, the evidence implicating defendant in this case was overwhelming—indeed, defendant did not even contest the State's assertion that he was the one who repeatedly stabbed Butler. Further, defendant did not challenge Butler's credibility then, and does not challenge her credibility now. That is, defendant does not contend that Butler lied about anything when she testified. Defendant's trial strategy—as the defense explained to the jury during its opening state-

ment—was only to convince the jury that he did not possess the requisite intent to kill her.

Moreover, assuming that defendant had been permitted to impeach Butler with her previous conviction for domestic battery, and assuming further that such impeachment would have completely discredited Butler's testimony in the minds of the jurors, a reasonable jury could have found defendant guilty beyond a reasonable doubt based solely on the State's other evidence. That additional evidence related to defendant's intent to kill Butler was as follows: (1) Gilmor's testimony that she heard Butler pounding on her kitchen door, pleading, "please don't let me die"; (2) responding officers' testimony that Butler feared she was dying; (3) the 9-1-1 dispatcher's testimony that her fellow dispatcher received a call from defendant, not to summon help for Butler, but to admit doing something "really bad," while threatening to kill himself; (4) defendant's sister's testimony that defendant (a) showed up at their mother's house covered in blood and (b) admitted stabbing Butler; (5) testimony from police that they found defendant standing in his mother's kitchen, crying and repeatedly asking them to kill him; (6) the responding paramedic's testimony describing the dire nature of Butler's condition when he arrived, namely, that Butler had multiple wounds and lacerations, had lost a lot of blood, and was having difficulty breathing; and (7) Butler's emergency-room doctor's testimony that she (a) appeared to be "critically ill" when she arrived, (b) was not communicating well, and (c) had stab wounds to her torso, arms, armpits, wrists and back, including multiple stab wounds to a critical area surrounding her heart.

In light of defendant's trial strategy and the overwhelming evidence of defendant's intent to kill Butler, we conclude that the trial court's failure to allow defendant to impeach Butler with her prior domestic-battery conviction, if erroneous at all, was harmless beyond a reasonable doubt.

### D. Defendant's Contention That the Trial Court Erred by Failing To Restrict the State From Introducing a Knife That Was Unconnected to Him or the Crime

Defendant next contends that the trial court erred by failing to restrict the State from introducing a knife that was unconnected to him or the crime. Specifically, defendant asserts that, over objection, the court improperly allowed the State to introduce into evidence a knife taken from defendant's mother's home that was not relevant to its theory of the case. The State responds that defendant has forfeited this issue because he failed to include it in his posttrial motion and has failed to demonstrate that the use of the knife by the State was

plain error. Defendant concedes that he forfeited this issue, but nonetheless asserts that because "this was a close case," we should review it for plain error. For the reasons that follow, we reject defendant's claim that the evidence presented in this case was close and agree with the State that defendant has forfeited review of this issue.

## 1. *Forfeiture and Plain-Error Review*

"To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion." *Thompson*, 238 Ill. 2d at 611. Otherwise, he has forfeited the issue. *Thompson*, 238 Ill. 2d at 612. Nonetheless, a defendant may bypass such forfeiture when plain error occurs. *Thompson*, 238 Ill. 2d at 613.

Plain error occurs when the error is "clear and obvious" and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Under the first prong, a defendant must prove that the unpreserved error was prejudicial. *Piatkowski*, 225 Ill. 2d at 564, 870 N.E.2d at 410. Under the second prong, the burden of proof is again on the defendant, but this time he must show that the error was serious—that is, it affected the fairness of the proceeding (*People v. Lewis*, 234 Ill. 2d 32, 47, 912 N.E.2d 1220, 1229 (2009)) and "challenged the integrity of the judicial process" (*Piatkowski*, 225 Ill. 2d at 565, 870 N.E.2d at 410-11).

## 2. *Plain Error and This Case*

As previously discussed, the usual first step in plain-error analysis is to determine whether any error occurred. See *Thompson*, 238 Ill. 2d at 613 (determining whether error occurred at all before conducting its plain-error analysis). However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel (*People v. Haynes*, 399 Ill. App. 3d 903, 908, 927 N.E.2d 819, 824 (2010) ("Where the defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance.")), the first step of plain-error analysis is merely a "matter of convention." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). When, as here, the record clearly shows that plain error did not occur, we will reject it without further analysis.

Although it is not at all clear to us from the record why (1) the State thought the knife from defendant's mother's house—which was not the knife recovered from the Butler's hallway—was probative and

(2) the trial court admitted the knife into evidence, we need not definitively resolve whether the court's decision to admit the knife was erroneous. Contrary to defendant's claim, this was not a close case because the evidence of defendant's intent to kill Butler was *not* closely balanced, nor did the introduction of the knife affect the fairness of the proceeding. Thus, assuming for the sake of argument that the introduction of the knife was erroneous, such an error did not remotely threaten to (1) tip the scales of justice against defendant or (2) challenge the integrity of the judicial process.

Again, the State presented extensive evidence of defendant's intent to kill Butler. Specifically, the State presented evidence from (1) Butler, regarding the circumstances leading up to the attack and the fact that defendant took her cellular telephone with him when he left her either dying or for dead; (2) Gilmor, regarding Butler's pleas to her not to "let [her] die"; (2) responding officers, regarding Butler's fear that she was dying; (3) the 9-1-1 dispatcher, regarding defendant's failure to report the attack to allow paramedics to respond; (4) defendant's sister, regarding defendant's actions immediately following the attack; (5) police, regarding defendant's hopes that they would kill him; (6) the responding paramedic, regarding the dire nature of Butler's condition when he arrived; and (7) the emergency-room doctor, regarding the critical and extensive nature of Butler's life-threatening wounds. Indeed, that Butler survived defendant's knife attack is amazing. But her survival does nothing to diminish the intent with which defendant stabbed Butler, which clearly was to kill her. That she survived merely shows that despite his intent and efforts toward that end, he is an incompetent killer.

Given this evidence and the nature of the alleged error in this case, we do not view the trial court's failure to bar the State from introducing the knife, if erroneous at all, as plain error. Accordingly, we honor defendant's procedural default. See *Naylor*, 229 Ill. 2d at 593, 893 N.E.2d at 659-60 (procedural default must be honored when a defendant fails to establish plain error).

### E. Defendant's Contention That the Trial Court Erred by Failing To Bar the State's Lead Witness From Sitting at Counsel's Table

Defendant next contends that, over objection and despite a motion to exclude witnesses, the trial court erred by failing to bar the State's lead investigator from sitting at the State's counsel table throughout the case. Without pointing to any specific testimony, defendant implies that the investigator's mere sitting at counsel's table improperly influenced his testimony because he was able to hear the other witnesses' testimony, potentially allowing him to tailor his testimony to

correspond to theirs. The State responds that defendant has forfeited this issue because he did not raise it in his posttrial motion. We agree with the State.

As previously explained, "[t]o preserve a claim for review, a defendant must *both* object at trial and include the alleged error in a written posttrial motion." (Emphasis added.) *Thompson*, 238 Ill. 2d at 611. Otherwise, he forfeits appellate review of that issue. *Thompson*, 238 Ill. 2d at 612.

Here, defendant failed to include the alleged error in his written posttrial motion. Therefore, we conclude that he has forfeited review of that issue. Because (1) defendant does not contend that the alleged error amounts to plain error and (2) no error appears on the face of this record, we honor defendant's procedural default without further analysis. See *People v. Hillier*, 237 Ill. 2d 539, 549, 931 N.E.2d 1184, 1190 (2010) (explaining that when a defendant forfeits review of his claims and does not argue plain error, the appellate court should not reach the merits of those issues).

## F. Defendant's Contention That the Trial Court Erred by Barring the Defense From Referring to Butler's Alcohol Consumption During Its Closing Arguments

Defendant next contends that the trial court erred when it barred the defense from referring to Butler's alcohol consumption during its closing arguments. Specifically, defendant asserts that the court violated his right to effective assistance of counsel when it barred his attorney during closing argument from arguing the "reasonable inference that the alcohol might have affected [Butler's] perceptions." Given defendant's trial strategy and the State's evidence, we conclude that even if the court's decision to bar the defense from referring to Butler's alcohol consumption was erroneous, that error was harmless.

Prior to closing arguments in this case, the defense argued vigorously to the trial court that it should be allowed to explain to the jury that it could infer from Butler's alcohol consumption (less than two beers) that she did not fairly recollect the events that took place the night defendant attacked her. The court responded that it would not allow the defense to argue that inference because the evidence at trial did not support that theory, given that the evidence at trial was that Butler was "on" her second beer and that she only had problems recalling what happened *after* the attack. Although the record appears to support the court's discretionary call to bar the defense from arguing a theory for which not a shred of evidence had been presented, we need not reach the merits of defendant's claim of error because, even if it the court's decision did constitute error, that error was so clearly harmless.

An error that does not implicate a constitutional right is harmless when no reasonable probability exists that the jury would have acquitted the defendant absent the error. *In re E.H.*, 224 Ill. 2d 172, 180, 863 N.E.2d 231, 235 (2006) (citing *People v. Nevitt*, 135 Ill. 2d 423, 447, 553 N.E.2d 368, 377 (1990)). Assuming for the sake of argument that defendant had been allowed to make his argument at closing and that the jury did, in fact, infer that Butler was so intoxicated that she did not correctly recall the events the night of the attack, so what? Defendant did not then—and does not now—contest that he was the person who stabbed Butler 23 times in the chest, back, and arms.

Given defendant's trial strategy and the State's overwhelming evidence of defendant's intent to kill Butler—which we have previously outlined at length—we conclude that the trial court's decision to bar the defense from referring to Butler's alcohol consumption during its closing arguments, if erroneous at all, was harmless.

### G. Defendant's Contention of Cumulative Error

Defendant also contends that his trial was so "plagued by judicial error" that we should grant him a new trial. In short, defendant posits that the cumulative effect of the errors in this case denied him a fair trial. We disagree.

Cumulative error requires reversal when, as a result of multiple trial court errors, a defendant is denied a fair trial. See *People v. Blue*, 189 Ill. 2d 99, 139, 724 N.E.2d 920, 941 (2000). To determine whether a defendant's right to a fair trial has been compromised, we must decide whether the integrity, reputation, and fairness of the judicial process has been compromised. *Blue*, 189 Ill. 2d at 138, 724 N.E.2d at 940-41.

Defendant's only trial strategy in this case was to convince the jury that he lacked the requisite intent to kill Butler. As previously noted, the jury was unpersuaded by this strategy and found him guilty. We also note that we have previously concluded that some of the errors defendant relies upon when making this cumulative-error claim are not errors in the first place.

Having reviewed defendant's contentions and the record in this case, it is an understatement to say that we are confident that the integrity, reputation, and fairness of the judicial process were not compromised. Put another way, we are convinced that defendant received a fair trial.

### III. DEFENDANT'S CLAIM THAT THE TRIAL COURT IMPROPERLY INCREASED HIS SENTENCE

Defendant also argues that the trial court improperly increased his prison sentence from 20 years to 24 years. Specifically, defendant

contends that (1) the court had no authority to increase his sentence after it imposed the original 20-year term and (2) the court improperly considered the fact that he exercised his right to trial as a factor in aggravation. We address defendant's contentions in turn.

## A. Defendant's Contention That the Trial Court Lacked the Authority To Increase His Sentence From 20 Years to 24 Years

Defendant first contends that the trial court lacked the authority to increase his sentence from 20 years to 24 years. Specifically, defendant asserts that once the court imposed a 20-year prison term, it could not deviate upward from that sentence without violating his right to due process of law. Because we conclude that the court did not "impose" a 20-year prison term before it sentenced defendant to 24 years in prison, we reject defendant's contention.

### 1. *The Pertinent Portion of the Sentencing Hearing in This Case*

At defendant's April 2009 sentencing hearing, the trial court appeared to sentence defendant to 20 years in prison when it stated as follows:

> "[W]hat sticks out in [the court's] mind is the victim impact statement. ['I still remember the terror I felt. And that's not going to go away in [7] years, 10 years, 30 years.['] So [the court] thinks a 20[-]year sentence to the Illinois Department of Corrections [(DOC)] is appropriate, and [the court] will sentence [d]efendant to 20 years in [DOC]. The fines that were requested by the State are imposed.
>
> We're going to recess."

Shortly thereafter, however, the trial court returned to (1) explain the reason for its abrupt recess and (2) clarify its pronounced term of imprisonment, as follows:

> "Okay. We are back on the record [in this case]. There was a recess due to outbursts and perhaps one of the spectators fainted or passed out or something. [The court] understand[s] that *** they gave her oxygen and she did regain consciousness ***.
>
> So, but [the court] primarily is concerned because [it] started speaking *** and then [was not] able to finish. And as [the court] started stating [its] sentence, [the court] said that 20 years [was] to [it] reasonable. However, the recommendation of the State was 24 years *** and it [was in] applying the 85 percent sentencing provision that [the court] had this 20 years in [its] mind ***.
>
> So [the court's] sentence is the 24 years that was recommended by the State. *** 85 percent of that sentence will have to be imposed[,] which brings [it] down to 20 years. So [the court] want[s] to be clear *** that [the court] thought the State's recommendation was reasonable[,] but then [the court] started [and] had 20 [years] in [its] mind because that is the 85 percent rule ***.

So the sentence that [the court is] imposing for all the reasons that were set forth earlier is 24 years."

## 2. *Section 5—8—1(c) of the Unified Code of Corrections and the Standard of Review*

Section 5—8—1(c) of the Unified Code of Corrections states, in pertinent part, that a "court may not increase a sentence once it is imposed." 730 ILCS 5/5—8—1(c) (West 2008). Defendant's claim in this case requires us to determine whether the trial court "imposed" a 20-year term of imprisonment because, given the plain language of section 5—8—1(c), if it did, the court could not later increase that sentence to 24 years. As this question requires us to interpret section 5—8—1(c), our review is *de novo*. See *People v. Magee*, 374 Ill. App. 3d 1024, 1033-34, 872 N.E.2d 63, 71-72 (2007) (reviewing *de novo* the question of whether a sentence had been "imposed" for purposes of section 5—8—1(c)).

## 3. *The "Imposition" of a Sentence and the Trial Court's Sentence in This Case*

In *Magee*, the court concluded that a sentence had not been "imposed" for purposes of section 5—8—1(c) until after the sentencing hearing had concluded. *Magee*, 374 Ill. App. 3d at 1034-35, 872 N.E.2d at 72 (where trial court pronounced its sentence but later corrected its pronouncement after being reminded of certain facts before the sentencing hearing was concluded). That court noted that to hold otherwise "would be unreasonable and a waste of judicial resources." *Magee*, 374 Ill. App. 3d at 1035, 872 N.E.2d at 72.

In this case, as the record demonstrates, the trial court misspoke when it first *pronounced* defendant's sentence. After a short recess, which the court was compelled to take because of a serious disruption in the courtroom, the court explained that it had misstated its sentence and corrected itself on the record, at which time it *imposed* defendant's 24-year sentence. We conclude that the court's actions in this regard were entirely appropriate.

## B. *Defendant's Contention That the Trial Court Improperly Considered the Fact That He Exercised His Right to Trial as a Factor in Aggravation*

Defendant next contends that the trial court improperly considered the fact that he exercised his right to trial as a factor in aggravation at sentencing. In support of this contention, defendant relies on the following statement that the court made during a pretrial hearing: "[I]f [defendant is] pleading guilty to something th[en] you are wasting [the court's] time on having a trial [and the court] can take that into

consideration [at] sentencing." After reviewing the record, we conclude that the court did not consider defendant's decision to exercise his right to trial as an aggravating factor at sentencing.

### 1. *The Pertinent Exchange During the Pretrial Hearing*

Prior to trial, defendant moved to exclude Butler's statement, "Don't let me die," on the basis that Butler was not qualified to give medical opinion testimony. In the course of arguing that motion, the following exchange occurred between defense counsel and the trial court, which resulted in the court's denying defendant's motion:

"[DEFENSE COUNSEL]: Judge, let me just give the [c]ourt a little additional backdrop here. As we have stated from the get[-]go in open court, the issue here is not whether the act itself was committed. I think the evidence is going to be clear at trial.

THE COURT: Are you going to be admitting certain *** counts then ***[?]

[DEFENSE COUNSEL]: We'll be telling the jury in opening and closing statements that—

THE COURT: Well, that would be [c]ount 2, [c]ount 3, [c]ount 4. They are all aggravated battery.

[DEFENSE COUNSEL]: Yeah. This case is not about the aggravated battery.

THE COURT: Are you going to admit those three counts?

[DEFENSE COUNSEL]: We're not pleading guilty to them, but it's going to be argued and the theory of the case to the jury is going to be that he is in fact guilty of the aggravated battery.

THE COURT: Then why are you not admitting them? Why are we going through a trial for something that he is admitting?

[DEFENSE COUNSEL]: I don't want to get into where we've been with the negotiations.

THE COURT: [The court has] nothing to do with the negotiations.

[DEFENSE COUNSEL]: I understand.

THE COURT: And believe me[, the court does not] want to go down that road either.

[DEFENSE COUNSEL]: If the [c]ourt would just let the defense handle its own trial strategy, our trial strategy is that the jury needs to decide whether this is an aggravated battery or an attempted murder and if we take away from the jury the option of finding this is an aggravated battery, then I think that *** hurts *** [d]efendant's case. ***

THE COURT: Can that not still be on the table if he admits that he pled guilty to aggravated battery?

[DEFENSE COUNSEL]: Well, if he admits to it, then the jury loses part of its role so—

THE COURT: No. You're telling [the court] that [it is] supposed to have a trial, a four-day trial—

[DEFENSE COUNSEL]: Right.

THE COURT: —and bring in jurors on an aggravated domestic battery case that you are going to tell the jury you did?

[DEFENSE COUNSEL]: We're going to get to trial for four days either way. We've got an attempted murder charge here; and yes, we plan on having a strategy here where we tell the jury that we think that what happened here was an aggravated battery; and we're going to have a four-day trial regardless.

THE COURT: Well, we're not dragging this out[, the court will] tell you that.

[DEFENSE COUNSEL]: No. The evidence is going to be the same. The witnesses are going to be the same; and if he pled guilty to any of the counts, we'd still have to have the exact same trial because the issue in this case is whether or not there was a mental state where there's [evidence] beyond a reasonable doubt that he intended to commit murder.

THE COURT: Great. So that applies to [c]ount 1. What about [c]ounts 2, 3, and 4?

[DEFENSE COUNSEL]: We don't have much of a defense on that. I think it's important that the [c]ourt realize in terms of the motions *** what the case really involves and what the role of the jury in this case is. So that's why I bring it up. Not that he wants to plead guilty but there's very little dispute in this case that there was a stabbing.

In fact, the evidence is going to be clear that [defendant] called the police and said that he had done a terrible thing and that he called the police and said the he had stabbed his girlfriend. And the question in this case is whether or not he did so with the intent to commit murder. We have been very open with the [c]ourt on that issue. We've talked to the State about that issue. He's not going to plead guilty to it because the jury has to decide what it is, and there's no elongation of the trial.

THE COURT: They don't have to decide what it is. [The court] think[s] you are misrepresenting that. It can be both.

[DEFENSE COUNSEL]: It could be or it could be one or the other.

THE COURT: No. It's guilty or not guilty of attempted murder, guilty or not guilty to aggravated domestic battery. No whatever. You are saying one or the other.

[DEFENSE COUNSEL]: I'm not going to debate the trial strategy, and I'm telling the [c]ourt it's not going to affect the witnesses at all. I'd like to argue the motion *** and he's not going to plead guilty ***. So any discussion on that—

THE COURT: Fine.

[DEFENSE COUNSEL]: I don't think it's fair to ask [c]ounsel to even broach that subject because that's not what we're here about *** and if there's going to be a plea, it can be worked out by both parties *** and he has the right to have his trial.

THE COURT: He has the right to have his trial. He has the right to plead not guilty. If you are sitting here [saying], and [the court does not] know, [but *it can] check [its] factors in aggravation[,] but if he's pleading guilty to something that you are wasting [the court's] time on having a trial[, the court] believe[s it] can take that into consideration in sentencing.*

[DEFENSE COUNSEL]: The [c]ourt can consider any aggravation [it] like[s], but I will tell the [c]ourt [that it] will see from the evidence at trial that there is a legitimate issue.

THE COURT: That may be with regards to [c]ount 1, but you are still telling [the court] that you are going to drag this out as to [c]ounts 2, 3, and 4.

[DEFENSE COUNSEL]: We're not dragging anything out. [The court will] see from the evidence that it's the exact same evidence." (Emphasis added.)

## 2. *The Trial Court's Clarification of Its Comments*

Two days later, the trial court clarified its comments from the hearing on defendant's motion *in limine,* as follows:

"THE COURT: This matter was before the [c]ourt on Tuesday for hearing on some motions ***. There was a considerable amount of discussion at that time concerning the trial, how much time we were going to need for trial, etc. And apparently it's been brought to the [c]ourt's attention that there was a concern about some comments that the [c]ourt may have made during the course of that proceeding.

So *** [defense counsel], [the court] *** had a phone conference with [you and the prosecutor,] and [the court] advised both of [you] that the purpose of [the court's] comments [was] to[,] if possible[,] shorten the length of the trial primarily because we have many other cases that also require trial. We have a limited amount of time, limited amount of resources, and [the court] wanted to make sure that if [it] set aside four days for a trial that we needed four days as opposed to perhaps being able to shorten this trial up to two days or three days. The attorneys basically after [the court's] questioning indicated that regardless of how *** [d]efendant chose to proceed it was going to be a four[-]day trial.

So [the court] understand[s] that either [defendant] or somebody in his family may have misinterpreted some comments [the court] made during that hearing. [The court] certainly did not mean to

imply in any way nor did [the court] think the attorneys took it this way either[,] but a concern was raised to [defense counsel] that the [c]ourt was somehow suggesting that if [defendant] did not plead guilty to these charges[,] that the [c]ourt would take that *** into consideration in sentencing or actually would sentence him to a what the family views as a harsher sentence because he did not plead guilty to these charges before the trial.

Is that an accurate summary ***?

[DEFENSE COUNSEL]: [T]hat is accurate, Judge. I think that oftentimes people have their own mental state and know what they intend, but when it comes out it could be interpreted in a different way. And I as [c]ounsel being in front of [this court] in other cases have always felt that [this court's] been fair and impartial in every case, and I have absolutely no concerns at all that the [c]ourt would do so in this particular case.

I think some of the comments in particular the [c]ourt indicated that it would consider it aggravation if the case proceeded unnecessarily and wasted the [c]ourt's time, and I think I viewed that as the flip side [of] that oftentimes there's mitigation if somebody pleads guilty.

THE COURT: Correct.

[DEFENSE COUNSEL]: You can call that aggravation or the absence of mitigation. Obviously, it's appropriate for the [c]ourt to consider as mitigation if somebody pleads guilty and admits *** wrongdoing, then the [c]ourt would be appropriate in considering that.

So I didn't interpret the [c]ourt's comments as a bias or unfairness or a pressuring of *** [d]efendant to plead guilty. But I think that when it was heard by family members and *** [d]efendant, that those were the concerns. I've spoken with *** [d]efendant since we were last in court and the family[,] and I brought the matter to the attention of the State's Attorney *** and *** the [c]ourt so that the [c]ourt would have the opportunity to clarify the comments and also admonish *** [d]efendant as to any rights that he may have in open court to file a motion for [s]ubstitution of judge based on cause and that another judge would hear that so I'd like the [c]ourt—

THE COURT: [The court] will go forward and do that.

[DEFENSE COUNSEL]: —to do that. But that's a summary as to what happened.

THE COURT: All right. And, [prosecutor], anything you want to add to that?

[PROSECUTOR]: Judge, that's how it was brought to my attention. ***

I suppose as very experienced lawyers, we are looking at things in a very different context oftentimes than laypersons are[,] and I guess sometimes we have to be careful to not be too focused on the mechanics of what it is we do[.] *** I think that's often what we get into[,] and *** I fully understood where the [c]ourt was going. We have this time allotted. It's always very busy during jury time. ***

In that context, *** I felt it would be a good idea to get on the record to allow those laypersons to maybe get a greater depth of understanding because I certainly didn't take that as any suggestion the [c]ourt was going to lean on *** [d]efendant or anything of that nature. But in retrospect, I could see how someone unschooled in what we do might take it that way.

THE COURT: Right. So *** the attorneys understood what the [c]ourt was saying, and perhaps [the court] did not pick the right words in how [it] said it. ***

So [the court] certainly did not mean by [its] comments to suggest that or put any pressure on [defendant]. He has every right to have a trial. He should have his trial. He is presumed innocent until he is proven guilty, and that is the whole purpose of the trial. [The court] just wanted to make sure that this was going to be a four[-]day trial rather than having this be a two[-]day trial.

So having said that, [defendant], [your attorney] suggested and [the court] believe[s] he has discussed it with you, you do have a right to file a motion for substitution from this [c]ourt for cause. *** That motion would be heard by another judge. [This court] would not hear it. ***

So, defense counsel, you indicated that you had spoken with [defendant] and the family. Do you need to speak with them again concerning the substitution or are you satisfied that you've discussed it with him?

[DEFENSE COUNSEL]: Judge, I have discussed it with [defendant] and the family[,] but I think it would be appropriate to take a recess now that he's had the opportunity to hear the [c]ourt's clarification.

THE COURT: Very good. [The court will] take a very short recess *** and when you are ready, let [the court] know.

[DEFENSE COUNSEL]: Thank you.

THE COURT: [B]ack on the record ***. ***

[Defense counsel], you've had an opportunity now to review this matter with your client and his family?

[DEFENSE COUNSEL]: That's right, Judge. There's no anticipation of any motion for substitution of judge. We'd like to keep the matter set for jury trial and proceed as currently set.

THE COURT: Okay. Very good. Then [the court] certainly apologize[s] for any misunderstanding.

* * *

THE COURT: All right. [Defendant], [your attorney] has discussed with you your right to file a motion for substitution of judge for cause. Yes?

THE DEFENDANT: Yes.

THE COURT: All right. And you've heard the [c]ourt's comments, both the comments that *** gave rise to this and then [the court's] comments today. You've discussed this option with [your attorney], and you do have the right to file this motion for substitution for cause. Is it your desire to not file that at this time?

THE DEFENDANT: Yes.

THE COURT: *** If you don't file it now, then we will go to trial[,] and I will be the judge hearing that trial. Okay?

THE DEFENDANT: Okay.

THE COURT: Nobody's forced you to not file this motion?

THE DEFENDANT: No.

THE COURT: Nobody's promised you anything if you don't file it.

THE DEFENDANT: No.

THE COURT: Do you think you've had a full opportunity to discuss this decision with [your attorney]?

THE DEFENDANT: Yes.

THE COURT: And you are satisfied at this point based upon the clarification of [the court's] comments?

THE DEFENDANT: Yes."

### 3. *Defendant's Sentence in This Case*

Although the record ultimately shows that the trial court did not consider the fact that defendant exercised his right to trial as a factor in aggravation at sentencing, we can understand why defendant thought that it did, given the court's unfortunate wording. However, the court later clarified what it really meant to say. Nonetheless, we note that the court's pretrial remarks were unnecessary and regrettable. Defense counsel's explanation—which we note he was not required to give—should have satisfied the court. Indeed, the dialogue relating to defense counsel's trial strategy should not have taken place at all. Nonetheless, we conclude that the record from defendant's sentencing hearing demonstrates that the court did not consider defendant's exercise of his right to trial in determining the appropriate prison sentence.

### IV. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As

part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.

Affirmed.

JUSTICE POPE, dissenting:

I respectfully dissent. In this case of first impression, despite a challenge for cause, the trial judge allowed her husband to be seated on a jury in a case over which she was presiding. While the majority finds this "unusual," it fails to discuss the potential ramifications of having a judge's family member serve on a jury over which that judge is presiding, nor does the majority discuss defendant's right to a fair and impartial jury, nor the perception of the public of the fairness of our judicial system when the trial judge's spouse is allowed to sit as a juror despite a challenge for cause.

The majority seeks to accord responsibility to defendant, despite his challenge of the judge's husband for cause and preservation of the error in a posttrial motion. By the end of jury selection, no peremptory challenges remained for defendant to exercise. At the time of the cause challenge, counsel had already decided to use his two remaining peremptories on forthcoming potential jurors. The majority states defendant could have used a peremptory to strike the judge's husband and, if he later ran out of peremptories, could have asked the judge for an additional peremptory. However, where the trial judge refused a cause challenge with respect to her husband, it seems extremely unlikely defendant would have been successful in obtaining an extra peremptory challenge at a later time.

The majority fails to discuss the myriad of problems that can be foreseen when a trial judge allows a close family member to serve on a jury. First, as defendant points out in his posttrial motion, a judge's spouse would be expected to look unkindly upon a defense attorney who, in vigorously representing his client, engages in heated discussions with the judge. Additionally, under canon 3 of the Judicial Code of Conduct, also known as Supreme Court Rule 63(C)(1), a judge is to disqualify herself in a proceeding in which the judge's impartiality might reasonably be questioned. Ill. S. Ct. R. 63(C)(1) (eff. Mar. 26, 2001). A nonexhaustive list of examples is provided in subsections (a) through (e) of the canon. Certainly the gist of the rule recognizes it is improper for a judge to preside in a case where the trial judge could be called upon to make a ruling concerning a family member.

There are many reported decisions where it becomes necessary for a trial court to inquire into allegations of juror misconduct. If such an accusation were made against the trial judge's husband, the trial

judge would have to rule on an issue directly impacting a family member. Additionally, other jurors might be inclined to be influenced by or to acquiesce in the juror-spouse's view of the case. A trial judge repeatedly admonishes the jurors during a trial to refrain from discussing the case, even with other jurors, prior to deliberations. Here, the jurors were all aware, as was defendant, that Mr. Bauknecht would be going home at the end of each day of this three-day trial to cohabitate with the trial judge. Certainly, in light of the special relationships between spouses, this created an appearance of special access by one of the jurors to a major player in the trial—the trial judge.

The majority also fails to discuss the out-of-state cases dealing with this very issue. Where, as here, no Illinois case has been decided on this issue, it is appropriate to look at other state court decisions involving similar circumstances.

In *People v. Hartson*, 553 N.Y.S.2d 537 (N.Y. App. Div. 1990), the trial judge's wife was seated as a juror. No challenge was made to her service as a juror, despite full disclosure of her relationship to the trial judge. *Hartson*, 553 N.Y.S.2d at 538. The defendant had several peremptory challenges remaining at the time. The defendant was convicted of rape and then moved to set aside the verdict because the judge's wife served as a juror. The New York court found the juror's service gave the unmistakable appearance of impropriety and rejected the State's position the defendant was required to show evidentiary proof of actual prejudice. *Hartson*, 553 N.Y.S.2d at 538. The court found the interest of the "public at large," and not just the defendant, needed to be served. (Internal quotation marks omitted.) *Hartson*, 553 N.Y.S.2d at 538. Although not all ethical violations involving the appearance of impropriety necessarily warrant reversal and a new trial, the court found the right to the "fact and appearance" of a fair jury is so fundamental that the service of the judge's spouse as a juror required reversal of the defendant's conviction. (Internal quotation marks omitted.) *Hartson*, 553 N.Y.S.2d at 539. The *Hartson* court found no actual prejudice need be demonstrated nor was it even necessary for the defendant to have challenged the juror to merit reversal.

In *State v. Tody*, 2009 WI 31, 764 N.W.2d 737, a trial judge allowed his mother to be seated as a juror in a criminal trial. The Supreme Court of Wisconsin interestingly described its view of the situation as follows:

> "The immediate reaction of the members of the court upon hearing the facts of the case was that the presence of the circuit court judge's mother on the jury raises red flags of danger of juror bias and of a circuit court judge having to rule on matters involving a member of his or her family." *Tody*, 2009 WI 31, ¶4, 764 N.W.2d 737.

In *Tody*, as here, the defendant's lawyer moved to strike the juror for cause, raising the close personal relationship between the juror and her son, the trial judge. In addition, despite having a peremptory challenge available, defense counsel refrained from applying it to the judge's mother. The Wisconsin Supreme Court found the failure to exercise the peremptory challenge did *not* result in a waiver of the defendant's right to raise on appeal the issue of whether the juror's inclusion violated the defendant's constitutional right to trial by an impartial jury. *Tody*, 2009 WI 31, ¶27, 764 N.W.2d 737.

Further, the court found the defendant was deprived of his right under the sixth amendment to the United States Constitution and article I, section 7, of the Wisconsin Constitution to be tried by an impartial jury independent of the trial judge. *Tody*, 2009 WI 31, ¶50, 764 N.W.2d 737. The Wisconsin court, as the New York court, did not require the defendant to demonstrate actual prejudice, stating, "A presiding judge's mother serving as a juror is a special circumstance so fraught with the possibility of bias that we must find objective bias regardless of the particular juror's assurances of impartiality." *Tody*, 2009 WI 31, ¶50, 764 N.W.2d 737. The defendant's conviction was reversed and the case was remanded for a new trial.

Likewise, the Supreme Court of Arkansas reversed a defendant's rape conviction where the trial judge failed to strike his wife from the jury for cause in *Elmore v. State*, 144 S.W.3d 278 (Ark. 2004). The court perceived the undoubtedly close relationship between the trial judge and his wife as raising an appearance of impropriety. *Elmore*, 144 S.W.3d at 280. The court recognized jurors would likely give more credence or weight to the judge's wife's views than other jury members. In reversing the defendant's conviction, the court noted a defendant's sixth-amendment right to a fair trial before an impartial jury is a fundamental element of due process. *Elmore*, 144 S.W.3d at 280. The fact the defendant had exhausted his peremptory challenges at the time the judge's wife was subject to *voir dire*, does not seem to have mattered at all to the result.

In sum, the court in *Hartson* reversed a conviction where the judge's spouse served on a jury without challenge, the *Tody* court reversed a conviction where the trial judge's mother served on the jury where the cause challenge was denied and the defendant still had peremptory challenges available, and none of the three out-of-state cases required a showing of actual prejudice.

While this court has stated "we will review the trial court's ruling on a challenge for cause only when an objectionable juror was forced upon a party after it had exhausted its peremptory challenges" (*Grady v. Marchini*, 375 Ill. App. 3d 174, 179, 874 N.E.2d 179, 184 (2007);

*Flynn v. Edmonds*, 236 Ill. App. 3d 770, 779, 602 N.E.2d 880, 885 (1992)), none of the cited cases involved an appearance of impropriety concerning the trial judge.

In this case, defendant had a right under both the federal and state constitutions to a trial before an impartial jury. See U.S. Const., amend. VI; see also Ill. Const. 1970, art. I, §8. Further, defendant had a right to a trial before a jury that *appeared* to be fair and impartial. "Trial judges should not give grudging acceptance to the defendant's constitutional right to a fair and impartial jury." *People v. Reid*, 272 Ill. App. 3d 301, 309, 649 N.E.2d 593, 599 (1995).

Under these circumstances, where a trial judge denied a cause challenge to service by the judge's husband as a juror, I believe reversal and remand for a new trial is required. Accordingly, I respectfully dissent. By this dissent, I do not mean to imply the trial judge or her spouse in fact engaged in actual impropriety. The *appearance* of impropriety alone, where the trial judge goes home each night of a three-day trial, to the same home where she resides with her husband-juror, is sufficient to call into question the fundamental fairness of defendant's trial.