NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180229-U

NO. 4-18-0229

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 12, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Woodford County |
| LUCAS F. SPRINGER, | ) | No. 17CF94 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed defendant's convictions for residential burglary and resisting a peace officer.

¶ 2    In December 2017, a jury found defendant, Lucas F. Springer, guilty of residential burglary (720 ILCS 5/19-3 (West 2016)) and resisting a peace officer (*id.* § 31-1(a)). In January 2018, the trial court sentenced defendant to 9 years in prison for burglary, 300 days in jail for resisting a peace officer, and ordered the sentences to run concurrently. (Defendant had a significant prior criminal history of burglary and criminal trespass to property, including criminal trespass to a residence with persons present.)

¶ 3    Defendant appeals, arguing (1) the trial court erred by failing to properly question prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) defendant was denied a fair trial because the State used inadmissible hearsay and statements

offered for impeachment as substantive evidence, (3) defense counsel provided ineffective assistance by failing to object to hearsay statements and the State's substantive use of impeachment evidence, and (4) cumulative error deprived defendant of a fair trial. We disagree and affirm.

¶ 4                                      I. BACKGROUND

¶ 5                                      A. The Charges

¶ 6        In September 2017, the State charged defendant with residential burglary (720 ILCS 5/19-3 (West 2016)) and resisting a peace officer. *Id.* § 31-1(a). The State alleged that on September 2, 2017, defendant (1) entered the dwelling place of another with the intent to commit therein a theft and (2) ran from a police officer who had detained him.

¶ 7                                      B. The Jury Trial

¶ 8        In December 2017, the trial court conducted defendant's jury trial.

¶ 9                                      1. *Voir Dire*

¶ 10       Immediately prior to bringing in the venire, the trial court asked defense counsel as follows: "[Counsel], as to the *Zehr* principles, what is your viewpoint on me asking about the defendant's failure to testify? You want me to ask that question?" Counsel responded, "Please."

¶ 11       Toward the end of *voir dire*, when the trial court asked the venire about the *Zehr* principles, codified in Illinois Supreme Court Rule 431(b), the court stated as follows: "The next principle is that the defendant's failure to testify cannot be held against him. We all enjoy under the Fifth Amendment to the Constitution the right to remain silent. Does anyone not understand this principle of law? Does anyone not accept this principle of law? All understand it. All accept it." Defendant did not object to the court's statements.

¶ 12                                      2. *The State's Case*

¶ 13    Dustin Brandon testified that on September 2, 2017, he lived in a house at 203 Sunny Lane in Eureka, Illinois, with two roommates, John Lutz and Brett Boertlein. Around 8 p.m., he went grocery shopping with Boertlein and Caterina Murrell, Lutz's girlfriend. When they returned, they noticed that the back door was halfway open. Brandon testified that the house was empty before they left and he had not given defendant permission to be in the house. Brandon walked to the front door while Boertlein and Murrell walked to the back door. Brandon opened the front door and saw defendant standing inside the house. Defendant mumbled something, asked Brandon if he "saw a cop out there," walked out the front door, "and then took off running." Brandon stated he noticed change was missing from the kitchen counter and the change jar on the counter. Brandon explained that he had "about $5 in quarters on the counter, and that was all gone, and then my roommate [Lutz] had a huge change jar," about a foot tall, that was halfway full when they left for the store but only a quarter full when they returned.

¶ 14    On cross-examination, Brandon testified that defendant had been at the house earlier in the day. Someone dropped defendant off around noon, and defendant stayed until 5 p.m. Defendant hung out with Brandon, Boertlein, Lutz, and Murrell during that time. Brandon stated defendant was intoxicated and was drinking alcohol during the day. Brandon stated that Lutz left between 5:30 and 6 p.m.

¶ 15    Boertlein testified that he lived with Lutz and Brandon on September 2, 2017. Boertlein's testimony was largely consistent with Brandon's. According to Boertlein, he and Murrell drove defendant to defendant's girlfriend's house at around 5 p.m. Boertlein stated that when they returned home from grocery shopping later that night, Boertlein entered the house and saw defendant scraping change off the kitchen counter. Boertlein stated that in his presence, no one gave defendant permission to come into the house when no one else was home.

- 3 -

¶ 16 Caterina Murrell testified, and her testimony largely corroborated Brandon and Boertlein's testimony. According to Murrell, Lutz went to his parents' house between 2 and 3 p.m., which was before defendant had left. Murrell stated that while they were shopping, she had to return to Sunny Lane to get more money to pay for the groceries. Murrell got money from a safe in the living room and left out the front door of the house. No one else was in the house when she left. Murrell testified that, in her presence, no one ever gave defendant permission to come back to the house or stay the night. Murrell further testified that defendant's mother had spoken with Lutz on the day of the trial. Based on the way Lutz was acting after the conversation, Murrell thought he was being pressured.

¶ 17 Nicholas Hitchens testified he lived at 201 Sunny Lane, next door to 203 Sunny Lane. In the evening on September 2, he and his girlfriend were sitting in their backyard by a fire when Hitchens saw defendant run towards them. Hitchens recognized defendant from seeing him earlier that day. Hitchens described that defendant ran towards his yard and stopped just short of the chain-link fence dividing the properties, almost as if he did not know it was there until he was right next to it. Defendant then ran "to the east through the back yards of the opposite neighbors to the east." Hitchens stated he called the police after his girlfriend spoke with the men living at 203 Sunny Lane.

¶ 18 John Lutz testified that he was 19 years old and was dating Caterina Murrell. On September 2, 2017, Lutz lived at 203 Sunny Lane with Brandon and Boertlein and had been living there for a few weeks. Previously, Lutz lived with his parents in Eureka. Lutz knew defendant because their siblings had married each other and they had "been friends for about two years on and off."

¶ 19 Lutz testified that defendant had been over to the Sunny Lane house before but

never stayed the night. On September 2, defendant arrived at about noon with "some drinks" to hang out. While there, defendant "was drinking a few," and he left "around 3:00 or 4:00." Lutz stated that later in the afternoon, he went grocery shopping with Brandon, Boertlein, and Murrell, although they took separate vehicles. Lutz stated he arrived home 15 minutes after the others and believed he arrived with Murrell. The State then asked Lutz the following:

"Q. Did you at any point in time tell the defendant he could come back to the house?

A. I had told him—we kind of had an understanding that if he was too drunk to stay at [his girlfriend's house], or something, that it was okay for him to come over because he didn't have anywhere else to go. So I didn't expressly give him permission that day, but we talked about it before.

Q. When did you talk about that before?

A. It was probably a couple months before this happened.

Q. So a couple months prior to this happening you were at—where were you at?

A. I was at my parents' house, and he came over once, and we just gave him some food and hung out with him a little bit, and then he left later. And we talked about it then."

¶ 20 Lutz acknowledged (1) they had the conversation only once, (2) he never told his roommates about the arrangement, (3) defendant did not notify him on that date he was coming over, and (4) Lutz did not give defendant permission on that date to be at the house alone. Lutz continued that the police came over on September 2, and he never told them about the arrangement, but he did "ask for charges to be pressed[.]" Lutz further acknowledged that he

knew defendant's family and that defendant's mother had spoken with him on the previous day of the trial although "[i]t wasn't anything major."

¶ 21　　On cross-examination, Lutz further explained the arrangement. Defendant was not allowed to stay at his girlfriend's house if defendant was too drunk. Lutz told defendant that if defendant could not stay with his girlfriend, he could stay with Lutz. The conversation occurred about a month or two before September 2, 2017. Lutz stated he did not think about discussing the arrangement with his roommates because they "all knew [defendant] before then [(meaning before moving in together)]."

¶ 22　　Lutz recalled that defendant had three or four 24-ounce cans of an alcoholic beverage with him when he arrived. Lutz stated defendant appeared "a little tipsy when he got there." By the time defendant left around 3 p.m., defendant "was pretty drunk." Lutz thought defendant was probably too drunk to stay at his girlfriend's place. Lutz stated that their arrangement was still standing. Regarding Lutz's telling the police he wanted to press charges, Lutz clarified he "was pretty confused as to what was going on when [he] got back," and between the police being present and "people *** telling [him] what was happening," he was "a little upset about it."

¶ 23　　On redirect, Lutz conceded that (1) defendant had never taken Lutz up on the offer to stay the night, (2) Lutz never had a conversation with defendant about the arrangement after moving out of his parents' house to Sunny Lane, and (3) Lutz never told the police about the arrangement. Lutz acknowledged telling the police on September 2 that he wanted "to press charges against [defendant] for breaking and entering as well as stolen goods[.]"

¶ 24　　On further redirect and recross-examination, Lutz conveyed the following. About a month and a half prior to defendant's trial, Lutz went to the Eureka police station with his

mother to try and tell the police that defendant had permission to stay at Sunny Lane that night based on their prior arrangement. Lutz spoke with an older officer, told him there was a "misunderstanding" in his written statement, and asked if anything could be done. The officer told Lutz there was nothing he could do. Lutz acknowledged he spoke with defendant's family about the case, but he insisted that they did not speak about his testimony and that he was not "badger[ed]" by them.

¶ 25    The State then presented Lutz's written statement to him. Lutz acknowledged writing the statement and agreed it was a true and accurate copy of his original statement. The State offered the written statement into evidence, and the trial court admitted it without objection from defendant. Lutz agreed that he wrote in his statement that he wanted defendant charged for "breaking and entering" but added that he wrote it down because "it was what all my friends were writing at the time."

¶ 26    On recross, Lutz further explained that he arrived 15 minutes after his roommates did that night, the police were there, and his roommates were upset. Lutz reiterated that he was 19 years old, had never filled out a police statement before, and that he spoke to friends and family about the incident. When Lutz went to the police station with his mom, the police did not let him write a new statement.

¶ 27    On further redirect, Lutz again acknowledged writing the statement and said it was the truth. Lutz stated, "I probably shouldn't have written it since I wasn't there when it happened." Nonetheless, Lutz agreed that, at the time he wrote the statement, he wanted defendant charged with breaking and entering.

¶ 28    On final recross, Lutz stated someone told him that the change was missing rather than Lutz discovering it was missing. However, Lutz did state he could tell that some had been

taken because "there was a pretty big pile before." Lutz clarified that at the time he wrote his statement, he did not know the change was missing and "basically [he] w[as] just restating something that had been told to [him]."

¶ 29     Andrew Noyes testified that he was a police officer in Eureka and shortly before 10 p.m. on September 2, 2017, he responded to a call at 201 Sunny Lane. On his way there, Noyes saw Officer Antawn Maxison with defendant at the corner of Sunny Lane and Route 117, about 500 feet east of 201 Sunny Lane. During the course of his investigation, Noyes spoke with Hitchens, Brandon, Boertlein, Murrell, and Lutz. Noyes stated he watched Lutz fill out the written statement. After his investigation, Noyes decided to have defendant placed under arrest because Lutz and Brandon wanted to "press charges."

¶ 30     Noyes then described an interaction he had with defendant "[i]n the hour prior to this incident." Noyes explained that the hospital called the police to give defendant "a ride to somewhere so that he was safe." Noyes and Maxison searched defendant and found he had nothing on him. They drove defendant to his girlfriend's house, where he knocked on the door and went to the back, but could not get in. Because he went out of the officers' view, defendant was searched again, and he still had nothing on him. This time, they drove defendant to Sunny Lane, he went into the backyard of one of the houses, and the officers left after defendant did not return.

¶ 31     Antawn Maxison testified he was a Eureka police officer and worked from 5 p.m. to 1 a.m. on September 2, 2017. At around 10 p.m., Maxison heard "a dispatch for something that happened at 201 Sunny Lane." The State asked, "What did you hear?" and Maxison replied, "It was a burglary." Maxison stated that on his way to responding to the call, he saw defendant, who matched a description Maxison had and whom Maxison recognized from previous

interactions that day.

¶ 32      Similar to Noyes's testimony, Maxison explained that (1) he had two interactions with defendant earlier in the day during which defendant was very drunk, (2) Maxison searched defendant and he had nothing on him, and (3) after the second interaction, Maxison dropped defendant off at Sunny Lane. Maxison testified that he went back on patrol "until we received another phone call." The State asked, "And the other phone call was what?" Maxison said, "The burglary."

¶ 33      Maxison then described seeing defendant at the corner of Sunny Lane and Route 117. Defendant consented to a search, and Maxison found what he later determined to be $18.09 in change in defendant's pockets. Maxison placed defendant in his squad car and drove the short distance to 201 Sunny Lane, where Noyes was conducting an investigation. Noyes informed Maxison that defendant "was identified as the person that was breaking into the home on Sunny Lane," and Maxison, who was standing outside his squad car with another officer, told defendant "to place his hands behind his back, [and] he was being arrested for burglary." Defendant began to run but fell after a short distance. Maxison then arrested defendant. Maxison testified he was wearing his police uniform and driving a marked squad car.

¶ 34      On cross-examination, Maxison clarified that he did not actually tell defendant he was a police officer when he arrested defendant. Maxison assumed defendant could tell based on his car and uniform and stated defendant recognized him from their earlier interactions.

¶ 35      The State rested, and defendant did not present any evidence.

¶ 36                          *3. Closing Arguments*

¶ 37      During closing arguments, the State focused on whether defendant had permission to be present and the testimony of John Lutz. The State read Lutz's written statement and

repeatedly argued to the jury that the written statement, asking to press charges for breaking and entering, was the true account of what happened on the night of the burglary. The State pointed out that Lutz never told the police or his roommates anything about the "arrangement" he supposedly had with defendant and noted that the arrangement was made months before the incident when Lutz lived at another house. The State also drew attention to defendant's family's speaking with Lutz about the case and Lutz and defendant being related by marriage as reasons for Lutz to change his story.

¶ 38　　　　Defendant emphasized (1) the differences in the roommates' stories, (2) defendant's intoxication, and (3) Lutz's age. Defendant argued that common sense would suggest that a drunk person would not ask the police to drop him off at a house he planned to rob. It was more likely that defendant was simply trying to find any place he could sober up and must have remembered the arrangement he had with Lutz. Further, defendant argued that Lutz was only 19, had never dealt with the police, and was living with roommates who were very upset when Lutz came home. However, after Lutz had time to think about it, he remembered their agreement. Lutz spoke with his mother, and the two of them went to the police station to try and sort things out, but the police did not let him change his statement. Defendant argued this evidence rebutted the idea that Lutz was making up a story for trial and demonstrated that defendant had permission to be in the house.

¶ 39　　　　　　　　　　4. *The Verdict and Sentencing*

¶ 40　　　　The jury found defendant guilty of residential burglary and resisting a peace officer. In January 2018, the trial court sentenced defendant to 9 years in prison for burglary, 300 days in jail for resisting a peace officer, and ordered the sentences to run concurrently.

¶ 41　　　　This appeal followed.

¶ 42                                        II. ANALYSIS

¶ 43         Defendant appeals, arguing (1) the trial court erred by failing to properly question

prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012),

(2) defendant was denied a fair trial because the State used inadmissible hearsay and statements

offered for impeachment as substantive evidence, (3) defense counsel provided ineffective

assistance by failing to object to hearsay statements and the State's substantive use of

impeachment evidence, and (4) cumulative error deprived defendant of a fair trial. We disagree

and affirm.

¶ 44                           A. Compliance with Rule 431(b)

¶ 45         Defendant first argues the trial court committed plain error by asking prospective

jurors if they understood and accepted the proposition that "defendant's failure to testify" could

not be used against him. The State responds that because defendant affirmatively waived the

issue by agreeing to the court's phraseology, he cannot assert plain error. We agree with the

State.

¶ 46                              1. *The Applicable Law*

¶ 47         In *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51, 129 N.E.3d 755, this court

explained the concepts of waiver and forfeiture, as follows:

              " 'Waiver is the intentional relinquishment of a known right, whereas

       forfeiture is the failure to make a timely assertion of a known right.' *People v.*

       *Bowens*, 407 Ill. App. 3d 1094, 1098, 943 N.E.2d 1249, 1256 (2011). 'In the

       course of representing their clients, trial attorneys may (1) make a tactical

       decision not to object to otherwise objectionable matters, which thereby waives

       appeal of such matters, or (2) fail to recognize the objectionable nature of the

matter at issue, which results in procedural forfeiture.' *Id.* The doctrine of plain error permits a reviewing court to consider arguments that a defendant forfeited by failing to raise them to the trial court. *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675. However, the plain-error doctrine does not apply to affirmative acquiescence. *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12, 992 N.E.2d 184. 'When *** defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack.' *Id.*"

¶ 48                                  2. *This Case*

¶ 49        We conclude that defendant waived the issue of whether the prospective jurors were properly instructed pursuant to Rule 431(b). When asking whether defendant wanted to ask the prospective jurors about the principle addressing defendant's right to refuse to testify, the trial court explicitly stated, "what is your viewpoint on me asking about the defendant's failure to testify? You want me to ask that question?" Counsel responded, "Please." Given the trial court's usage of the phrase "defendant's failure to testify," and whether counsel wanted the court "to ask *that question*" (emphasis added), we would expect counsel to correct the court as to the form of the question and clarify that he wanted subsection (b)(4) asked as it has been phrased since 2012: "if a defendant does not testify it cannot be held against him or her ***." Ill. S. Ct. R. 431(b)(4) (eff. July 1, 2012). Trial courts must use the form of the rule in place at the time of trial (see *People v. Schmidt*, 392 Ill. App. 3d 689, 710, 924 N.E.2d 998, 1017 (2009)) and may not deviate in any way from the precise language therein. *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35, 92 N.E.3d 494. However, counsel acquiesced to the trial court's terminology by responding "please" in the face of such a clear error. Our conclusion is further supported by the fact that

counsel did not object when the trial court asked the question of the prospective jurors or at any point thereafter. See *People v. Bell*, 2020 IL App (4th) 170804, ¶ 107, 145 N.E.3d 740 (warning that counsel needs to be vigilant to correct any improper deviations from Rule 431(b)).

¶ 50                              B. Hearsay Statements

¶ 51            As an initial matter, defendant acquiesced to the admission of the hearsay statements about which he now complains. Regarding Lutz's written statement, defense counsel explicitly stated he had no objection to its admission. Regarding similar testimony about the written statement or Lutz's other inconsistent statements, defense counsel (1) did not object during trial, (2) solicited testimony from Lutz regarding these statements during cross-examination, and (3) did not object in a posttrial motion. The record demonstrates that defense counsel acquiesced to the admission of the section 115-10.1 evidence. See 725 ILCS 5/115-10.1 (West 2016).

¶ 52            Defendant also contends that counsel was ineffective for failing to object to the hearsay statements and acquiescing to their admission. We disagree.

¶ 53                                  1. *The Law*

¶ 54                          a. Ineffective Assistance of Counsel

¶ 55            To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was (1) deficient and (2) prejudicial. *People v. Moore*, 2020 IL 124538, ¶ 29. To establish deficient performance, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Id.* Judicial review of counsel's performance is highly deferential. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 38, 83 N.E.3d 671. To establish prejudice, the defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different.

*Moore*, 2020 IL 124538, ¶ 29. A reasonable probability is defined as a probability which undermines confidence in the outcome of the trial. *Id.* Failure to satisfy either prong negates a claim of ineffective assistance of counsel. *Id.* "When a claim of ineffective assistance of counsel was not raised at the trial court, this court's review is *de novo*." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85, 126 N.E.3d 703.

¶ 56                                    b. Section 115-10.1

¶ 57           Section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2016)) permits the introduction of a witness's prior inconsistent statement as substantive evidence if (1) the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge" and (2) the statement is written or signed by the witness or the witness acknowledges under oath at trial to making the statement. *Id.* § 115-10.1(c). The "personal knowledge" required is the firsthand experience of the underlying event not statements from another about the event. *People v. Simpson*, 2015 IL 116512, ¶ 32, 25 N.E.3d 601. Section 115-10.1 permits the introduction only of the witness's prior inconsistent statements and not the hearsay statements of others. See *id.*

¶ 58           This court previously detailed the proceedings that parties and trial courts should use as a best practice when a prior inconsistent statement may be introduced only by having the witness acknowledge the statement under oath at trial. *People v. Brothers*, 2015 IL App (4th) 130644, ¶¶ 70-85, 39 N.E.3d 1101 *overruled on other grounds by People v. Veach*, 2017 IL 120649, ¶ 39, 89 N.E.3d 366. However, if the proponent of the prior inconsistent statement has extrinsic evidence that the statement was made in one of the forms designated by the statute, the procedure for admitting the statement is the same as it is for any other impeachment by prior inconsistent statement. *Id.* ¶ 68. Further, "[i]f the witness acknowledges in the presence of the

jury having made the prior inconsistent statement, that acknowledgement constitutes the evidence of the prior inconsistent statement for purposes of subsection (c)(2)(B) [of section 155-10.1 of the Code], and nothing more need be done for the prior inconsistent statement to be admitted as substantive evidence." *Id.* ¶ 78.

¶ 59                                    2. *This Case*

¶ 60            Defendant cannot demonstrate deficient performance because the evidence was properly admitted. Because Lutz acknowledged under oath at trial that he made the prior inconsistent statements, section 115-10.1 of the Code was satisfied. The *Brothers* framework describes the procedure for the introduction of prior inconsistent statements as substantive evidence when no extrinsic evidence (written statement or a recording) is available. Here, the State had a written statement signed by the witness. Accordingly, the procedure described in *Brothers* was not necessary.

¶ 61            Defendant next argues the written statement was inadmissible because Lutz did not have personal knowledge of the burglary. The only contested issue at trial was whether defendant had permission to be at the house by himself on the evening of September 2, 2017. Lutz had personal knowledge of whether he had given defendant permission to be there. His written statement that $10 in change was missing and he wanted defendant charged with "breaking and entering" is relevant to whether or not Lutz had given defendant the requisite permission. Accordingly, Lutz's written statement was within his "personal knowledge" irrespective of the fact that he was not present when defendant was in the house.

¶ 62                              3. *Other Hearsay Statements*

¶ 63            Defendant raises three other errors as contributing to his conviction. First, defendant notes that the State asked Noyes about Lutz's written statement, which had already

- 15 -

been admitted into evidence, and his testimony on the matter was both cumulative and objectionable. In *Brothers*, this court stated that if a witness acknowledges making a prior inconsistent statement, calling another witness to solicit the same information is cumulative and should not be permitted. *Brothers*, 2015 IL App (4th) 130644, ¶ 82. Here, the State showed Noyes Lutz's written statement and asked him foundational questions such as (1) who wrote it, (2) when, (3) where, and (4) whether Noyes observed Lutz writing it. The following exchange occurred:

"Q. Any point in time did [Lutz] convey to you that [defendant] had permission to be in the house that night?

A. No. He told me he didn't have permission.

Q. Did he specifically say those words?

A. He said that he was not—

[DEFENSE COUNSEL]: Objection. Calls for hearsay."

¶ 64 The trial court sustained the objection. Defendant contends that Noyes's prior nonresponsive statement that "[h]e told me he didn't have permission" should have been stricken. We agree that Noyes volunteered the information unbidden by the question from the State. We also believe it is likely that the trial court would have stricken the response had defense counsel asked. However, we find the error harmless.

¶ 65 Immediately after the sustained objection, the State asked Noyes if any of the individuals at the house indicated they gave defendant permission to be there, to which Noyes said, "No." This questioning was not improper and amounted to evidence that would lead the jury to the same conclusion as the nonresponsive, hearsay statement. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 59, 14 N.E.3d 622 (holding that a reviewing court may consider whether

the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence). Further, the State did not rely on the hearsay statement at all in its closing argument. Instead, the State focused on Lutz's testimony and the written statement itself, which we have already concluded was properly admitted as substantive evidence. Accordingly, Noyes's single statement was harmless.

¶ 66     Second, defendant argues that Maxison repeatedly stated that he was responding to a "burglary" call which prejudiced defendant. We are sympathetic to the argument that had counsel objected, the objection likely would have been sustained. In the typical criminal case, a police officer does not need to disclose the suspected crime for which an officer is going to a potential crime scene, and any such disclosure may be prejudicial to the defendant. See *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107, 8 N.E.3d 65. However, in this case, particularly during Maxison's testimony, the State had to distinguish between calls because Maxison interacted with defendant on three separate occasions that same day. The State managed to avoid disclosing the suspected crime with other witnesses and perhaps could have done the same with Maxison (for instance, by numbering or labeling the interactions).

¶ 67     Nonetheless, we conclude that because defendant did not object, we are unable to determine if the State's questions and Maxison's responses were error. As this court has explained, a description of the substance of a radio message to an officer may be admissible when it is necessary to describe police conduct. *People v. Matthews*, 2017 IL App (4th) 150911, ¶ 20, 93 N.E.3d 597; see also *Temple*, 2014 IL App (1st) 111653, ¶ 60 (explaining why testimony about responding to a "call of shots fired" was admissible to explain police conduct). In order to determine whether this is such a case, defendant needed to object and request a *Cameron* hearing. See *Matthews*, 2017 IL App (4th) 150911, ¶ 20 (citing *People v. Cameron*,

189 Ill. App. 3d 998, 546 N.E.2d 259 (1989)). (We note that trial courts may conduct these hearings *sua sponte* if they spot the issue and, in their judgment, believe it is necessary to interject in the absence of an objection by the parties.) As we noted, the State may have explained that it was asking about the specifics of each call (1) to help clarify things for the jury and witness and (2) not for the truth of the matter asserted. The trial court also could have weighed the prejudice of the information against the jury's need to hear it. Without this information, we cannot conclude error occurred.

¶ 68        Third, defendant asserts the State erred by soliciting testimony from Murrell that was not within her personal knowledge. Specifically, defendant contends that the State's questions about whether Murrell had heard anyone give defendant permission to be at the house "in [her] presence" were (1) irrelevant, (2) not based on what she perceived but what she did *not* perceive, and (3) substantially more prejudicial than probative of an issue in the case. We disagree.

¶ 69        The State's questions were entirely proper. The only contested issue in the case was whether defendant had permission to enter the house, and Murrell's testimony that she did not hear anyone give him permission on that day was relevant to the issue. Further, the questions were properly limited to what Murrell experienced, that is, whether on the day in question she personally heard any of the roommates tell defendant he could "come and go as he pleased."

¶ 70        Even viewing the questions in the light most favorable to defendant, they were still proper. The State clearly asked "any time *in your presence*" did one of the roommates give defendant permission to enter the house. Murrell stated she did not. We also note that because Murrell was Lutz's girlfriend, she had a greater likelihood than any other witness to know if Lutz had given defendant permission on some prior occasion. Defendant's complaint goes to the

- 18 -

weight of Murrell's testimony, not its admissibility.

¶ 71                                C. Cumulative Error

¶ 72       Last, defendant argues that all of the above complained-of errors combined to render his trial fundamentally unfair. We need not spend any time addressing this argument because, as we earlier concluded: (1) admitting Lutz's prior inconsistent statements as substantive evidence was proper, not error, and (2) counsel acquiesced to the trial court's questioning pursuant to Rule 431(b). Similarly, we concluded defendant's remaining allegations were either not error, were harmless error, or needed further proceedings to determine if an error occurred. For all of these reasons, we conclude any potential errors at trial did not render the proceedings fundamentally unfair or call the result into question.

¶ 73                                III. CONCLUSION

¶ 74       For the reasons stated, we affirm the trial court's judgment.

¶ 75       Affirmed.