2022 IL App (1st) 200167-U

No. 1-20-0167

Order filed March 29, 2022.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 11092 |
| | ) | |
| ZEB WALLS, | ) | The Honorable |
| | ) | William B. Raines, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: The State proved beyond a reasonable doubt that defendant committed vehicular invasion, where the evidence showed that defendant and codefendant entered or reached into the victim's vehicle by force while it was occupied and stole her phone. The trial court did not abuse its discretion in directing the empaneling of jurors or unduly limit defendant's use of peremptory strikes so as to result in any prejudice. The State did not commit prosecutorial misconduct in closing arguments. Last, the trial court did not abuse its discretion in answering the jury question during deliberations by responding that the jury had heard the evidence and should continue to deliberate.

¶ 2     Following a jury trial, defendant Zeb Walls was found guilty of vehicular invasion and sentenced to 4 years in prison. On appeal, he contends the State failed to prove him guilty beyond a reasonable doubt of vehicular invasion because the evidence did not establish he entered the vehicle by force with the intent to take the victim's property, and thus the State failed to prove the elements of the crime. He also contends that the trial court abused its discretion in using an alternate jury empaneling process that he claims effectively impaired his right to peremptory challenges and abused its discretion in failing to properly respond the jury's question posed during deliberations. Last, defendant contends the State committed prosecutorial misconduct in closing arguments by misstating the law of accountability and definition of force. We affirm.

¶ 3                          BACKGROUND

¶ 4     Defendant was arrested and charged with vehicular invasion after he and codefendant Dionte Young stole a cell phone from the car of Shirley Moncada, a driver for the ride sharing company, LYFT, while she was at a red light near the Chicago Loop. Young entered a guilty plea and was sentenced to four years in prison, while defendant chose to proceed to trial. The jury selection and empaneling process, which defendant also challenges, will be discussed in further depth in our analysis section. While the State maintained that defendant and Young acted with a common intent and criminal design to steal Moncada's phone, defendant maintained that he was an innocent party and Young initiated the entire incident without his knowledge, participation, or consent.

¶ 5     The State's evidence at trial revealed that around noon on July 8, 2018, Moncada, whose first language is Spanish, was driving southbound to the Art Institute on Michigan Avenue with two rideshare passengers, an older couple, in her backseat. As she stopped at a red light on Lake

Street, a man, later identified as Young, opened her unlocked front passenger door (the seat wasn't occupied), and asked her for $20. He made a face like he was starving while asking again for the money. Moncada, who felt nervous, repeatedly asked the man to close the door, but he refused and kept asking for the money. Meanwhile, defendant opened the unlocked driver's-side door and held a blue flier about five inches from Moncada's face. After placing the flier in her face, defendant did not reach further inside the vehicle or "place his body inside the door after he opened it." At this point, Moncada became afraid. She tried to close her door, but she could not because defendant was holding it open. Moncada briefly struggled with defendant in an effort to close the door before Young reached into the car and took Moncada's iPhone X, which was mounted to the windshield. The two offenders then fled north on Michigan Avenue, and Moncada pulled her door closed.

¶ 6 In describing the interaction, Moncada testified that when defendant showed her the flier, "he was a distraction to the other guy who took the phone." She also testified that when defendant opened the door, she was "trying to hold the door, but *** I didn't *** fight with him for so long because the other guy took the phone from the holder."

¶ 7 Darryl Bradford, age 64, was the rideshare passenger in the back passenger seat and testified to a similar occurrence as Moncada, only he described defendant as having "leaned into the car." He called police shortly after the incident, and the audio of the 911 call was admitted and published at trial.

¶ 8 Chicago Police Officer Ashoor Hoyou testified that he was working near the area of the offense covertly on foot and in plain clothes so as to catch robberies in progress. Around noon on the day in question, he heard sirens from a police vehicle heading east on Lake Street and then observed defendant and Young running westbound on Wacker Place and then southbound on

Wabash Avenue towards Officer Hoyou. They ran close together and looked behind their backs as if someone was chasing them. As they turned into an alley, Officer Hoyou saw Young hand defendant a phone, but he then lost sight of the two when they crossed State Street.

¶ 9     Chicago Police Officer Mathew Dorn testified he received a radio notification that there was a foot chase in progress and that two teens were fleeing westbound on Wacker Drive. Officer Dorn subsequently observed defendant and Young on Lower Wacker. As Officer Dorn approached defendant, who was sweating and breathing heavily, defendant asked, "What did I do, Officer?" and then fell to the ground. Officer Dorn placed defendant in handcuffs, stood him up, and then noticed an iPhone underneath him, which Officer Dorn recovered. Later, he also recovered two blue flyers, for the "Stoney Island Junior Bulls Youth Group," from inside defendant's pant leg. During a subsequent show-up at the scene, Moncada identified Young as the man who took her phone and defendant as the man who opened her door and presented the flyer. Moncada retrieved her phone and unlocked it with her passcode in front of the officers. Bradford identified defendant as one of the men who invaded Moncada's car. Officer Dorn's body camera was admitted into evidence and published to the jury.

¶ 10    Chicago Police Detective William Heneghan testified that he interviewed defendant following his arrest and the issuance of *Miranda* warnings. Detective Heneghan told defendant that he had been accused of "being part of a team that stole a phone from a vehicle." Appearing remorseful, defendant responded that was "exactly what happened." He and Young took the train downtown and defendant walked up to a vehicle pretending to be sick while also requesting a charitable donation with the flyer. Defendant explained this was the first time he had done this, although he admitted to often selling phones on the South Side at 61st or 63rd Street.

¶ 11    Following this evidence, the State rested, and defendant moved for a directed verdict. Defense counsel argued the evidence did not support that defendant entered the vehicle or that Young took Moncada's phone by force. The defense also argued defendant was not guilty under the theory of accountability. The State responded that defendant was accountable for Young's actions and had himself placed his hand and body into the interior of the car by force and tugged on the door. Defendant did this while it was occupied and with the intent to commit a theft, as he admitted to. Given those facts, the State asked the court to deny defendant's motion, which the court did.

¶ 12    Defendant, age 19, then testified on his own behalf. Defendant's direct testimony and cross-examination revealed that on the day in question, Young had called him around 10 a.m. asking if he wanted to make some money, and defendant said yes. Defendant described Young as an "older guy" from the neighborhood, although it was established that Young was only one year older than defendant and they had known each other about three years. Defendant and Young then met at the 63rd station, and while on the train, Young explained they would hustle money by using flyers for the Junior Bulls charity and asking people for donations, although they did not bring any type of container to collect the money. Defendant also acknowledged he was not a member of that organization and no such organization existed. Once downtown, they asked for donations for some 30 minutes without success. Defendant then noticed Moncada's car on Michigan Avenue. He walked over, placed the flyer "to her window," and asked Moncada for a donation of $20 for something to eat. Young meanwhile was already at the window speaking to the two backseat passengers. While defendant testified he "cracked" the car door, he denied trying to hold onto the door thereafter. He denied placing his hand, the flyer, or any part of his

body inside the car. Yet, on cross-examination, defendant acknowledged he opened the driver's side door and put the flier in Moncada's face.

¶ 13    Defendant testified that as the driver denied his request for $20, Young suddenly started running, so he did too. When he caught up to Young, Young handed him a "piece of paper" with the phone inside, although defendant suggested he did not know the paper contained the phone. They eventually stopped running at Lower Wacker. On cross, defendant stated that Young did not hand him the phone until they arrived underground and did so because Young "didn't want to take the blame" and defendant was younger. Defendant denied seeing Young take the phone, knowing Young was going to take the phone, or discussing taking a phone with Young at any point between the train and their interchange at the car. Defendant later urged Young to give the phone back but was unsuccessful and stated, "I'm not with you, we can go our separate ways." While Young then ran off, defendant stayed and was arrested. He acknowledged speaking with Detective Heneghan but denied his admissions.

¶ 14    In closing, the State argued defendant and Young acted as "teammates" in committing the vehicular invasion since they approached either side of the vehicle and each entered the vehicle, with defendant doing so by force. While defendant distracted Moncada, Young then stole the phone, and they ran from the scene "like teammates." The State thereby drew an analogy between their teamwork and that of basketball champions. Defendant denied any such criminal intent or common design, instead arguing that he proceeded downtown intending only to collect charitable donations, and it was Young who was solely responsible for the crime.

¶ 15    The jury deliberated for almost six and a half hours and asked several questions, which we discuss later in our analysis. Ultimately, the jury found defendant guilty of vehicular

invasion. Defendant filed a motion for a new trial, which was denied, and he was sentenced to four years in prison. This appeal followed.[1]

¶ 16                                ANALYSIS

¶ 17                        *Sufficiency of the Evidence*

¶ 18    Defendant first contends the State failed to prove him guilty beyond a reasonable doubt of all the elements of vehicular invasion. Because defendant challenges inferences flowing from disputed facts and the credibility of witnesses, we reject his request in his opening brief to review this case *de novo* and instead apply the familiar reasonable doubt standard. *Cf. In re Ryan B.*, 212 Ill. 2d 226, 231 (2004) (applying *de novo* review to a sufficiency of the evidence challenge to determine if uncontested facts satisfied the statutory elements of the offense). That is, when considering a challenge to a criminal conviction based upon the sufficiency of the evidence, we must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). In that sense, our function is not to retry the defendant or substitute our judgment for that of the trier of fact. *Id.* Rather, the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. A conviction will not be set aside on appeal unless the evidence is

---

[1]We note that defendant's notice of appeal incorrectly states that the judgment from which he appealed was issued on December 5, 2019. Instead, the record shows the final judgment of conviction issued on December 11, 2019. However, the notice of appeal was filed within the requisite 30-day period (on January 3, 2020). See Ill. S. Ct. R. 303 (eff. July 1, 2017). When considered as a whole and liberally construed, the notice of appeal adequately identifies the offense, sentence, complained-of-judgment, and informs the State of the nature of the appeal. See *People v. Lewis*, 234 Ill.2d 32, 39 (2009). We therefore have jurisdiction. See *id.*

so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 19    To prove defendant guilty of vehicular invasion in this case, the State was required to establish that defendant, or one for whom he was legally responsible, "knowingly, by force and without lawful justification" entered or reached into the interior of Moncada's vehicle while it was occupied "with the intent to commit" a theft or felony therein. 720 ILCS 5/18-6 (West 2018); 720 ILCS 5/5-2 (West 2018). It's clear that the language "by force and without lawful justification" refers to the manner in which the person charged with this offense "enters or reaches into the interior of a motor vehicle," and the action by force need not be carried out against a person, although clearly one or more persons must be present in the vehicle for the statute to apply. See 720 ILCS 5/18-6 (West 2018); *People v. McDaniel*, 2015 IL App (1st) 132679-U, ¶ 32; see also *People v. McClure*, 218 Ill. 2d 375, 381-82 (2006) (noting, the best evidence of legislative intent is the plain and ordinary language of the statute).

¶ 20    However, the entry or act of reaching inside the vehicle, the force used to effect it, and the theft or felony committed therein need not be contemporaneous, so long as there is some concurrence between the events. See *People v. Isunza*, 396 Ill. App. 3d 127, 129-32 (2009) (finding defendant accountable for vehicular invasion, where his codefendant reached into the victim's open car window and punched her twice in the head, thus satisfying the element of "using force to reach into a vehicle" to commit a felony, aggravated battery); *cf. People v. Robinson*, 206 Ill. App. 3d 1046, 1053 (1990) (noting that for attempted robbery, the "force or threatened force need not transpire before or during the time the property is taken; the force may be used as part of a series of events constituting a single incident."); *People v. Aguilar*, 286 Ill. App. 3d 493, 498 (1997) (holding similarly, only as to vehicular hijacking).

¶ 21    In addition to establishing the elements of the offense, the State also had to demonstrate defendant was accountable. See 720 ILCS 5/5-2(c) (West 2018) (a person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."). That is, the State had to show evidence that defendant either shared the criminal intent of the principal, Young, or there was a common criminal design with Young to commit vehicular invasion.[2] 720 ILCS 5/18-6 (West 2018); 720 ILCS 5/5-2 (West 2018); see *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common design rule, where two or more persons engage in a common criminal design or agreement, any acts in furtherance committed by one party are considered the acts of all parties, and all are equally responsible for the consequences of those further acts. *People v. Perez*, 189 Ill. 2d 254, 267 (2000). Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Fernandez*, 2014 IL 115527, ¶ 13. In addition, proof that a defendant was present during the offense, that he fled from the scene, that he maintained close ties with his companions after the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Perez*, 189 Ill. 2d at 267.

¶ 22    Defendant now contends the State failed to prove that he entered or reached into Moncada's unlocked vehicle by force with the intent to commit a theft therein. He characterizes

---

[2]Defendant maintained during oral arguments that he declined to challenge the sufficiency of the evidence as to accountability. However, defendant essentially raises a sufficiency of the evidence challenge to accountability, only in the context his claim against the State's closing arguments in this case. For that reason, we have chosen to address the matter of accountability here, where it properly belongs.

his actions as a mere distraction while Young snatched the phone. He likewise maintains that Young did not use any force in entering or reaching into the vehicle, and therefore, the evidence was insufficient to establish the offense.

¶ 23    Cases interpreting the vehicular invasion statute, which does not expressly define "force," have interpreted the term to mean, "the use of force or violence" or "power, violence, compulsion, or constraint exerted upon or against a person or thing." *People v. Isunza*, 396 Ill. App. 3d 127, 131-32 (2009); see also *In re Thomas T.*, 2016 IL App (1st) 161501, ¶ 14 (same). "Force is additionally defined as '[p]ower dynamically considered, that is, in motion or action; constraining power, compulsion; strength directed to an end.' " *Isunza*, 396 Ill. App. 3d at 131, citing Black's Law Dictionary 644 (6th ed. 1990). Whether a car window is open or a door is unlocked is not dispositive as to whether force was used when the defendant reached into or entered the vehicle. See *id.*

¶ 24    Here, viewing the evidence in a light most favorable to the State, as we must, we cannot say it was so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of defendant's guilt, where it showed that defendant and Young, while working in tandem, entered and reached into Moncada's vehicle by force with the intent to steal her phone. While Young opened Moncada's unlocked front passenger door, defendant then entered and reached into the unlocked driver-side door by placing his flyer about 5 inches from Moncada's face. Moncada became afraid and attempted to close her door but could not because defendant was holding it open. Moncada and defendant briefly struggled over the door before Young reached into the car and took Moncada's iPhone X. These facts show that defendant used constraining power, compulsion, and strength toward a specific end in holding Moncada's door open while Young, for whom defendant was accountable, stole the phone. Defendant thus facilitated Young in

stealing the phone. *Cf. People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 160 (noting that "in accountability cases based on common design, a defendant is accountable where he intentionally sets out to promote or facilitate the commission of a crime[.]").

¶ 25     Further evidence that defendant shared the criminal intent of Young, or alternatively, that they shared a common criminal design included their planned jaunt downtown via train for the admitted purpose of stealing phones. Defendant expressly confessed to Detective Heneghan that he was part of a team that stole a phone that day, and he sold phones on the South Side. Additional evidence supporting accountability included the fact that there was no charitable group that existed as advertised by the flyer and no container for defendant and Young's claimed panhandling; defendant and Young's teamwork in surrounding Moncada's vehicle; their subsequent flight; and Young's handing off of the phone to defendant during their flight. See *People v. Mullen*, 313 Ill. App. 3d 718, 725-26 (2000). Also, when they were apprehended by police a short while later, defendant fell to the ground in an apparent attempt to hide the phone underneath him.

¶ 26     These facts show the two shared a common purpose in committing the vehicular invasion and so the acts of one were the acts of both. See *id*.; *cf. Johnson*, 2014 IL App (1st) 122459-B, ¶ 133 (finding insufficient evidence of accountability for murder where there was no prior intent or advance planning by the defendant to transport the shooter, Clayton Sims, to the victim, nor evidence of a common criminal design since the defendant did not even know Sims or that he was armed when Sims entered the defendant's vehicle). While defendant claimed he did not have advanced knowledge of the phone stealing plan and claimed he did not participate in the enterprise when it occurred or thereafter, the jury evidently did not believe him.

¶ 27    This case is distinguishable from *Thomas T.*, 2016 IL App (1st) 161501, on which defendant relies. There, a taxi cab driver stopped at a light on Wacker Drive, and the respondent approached the front passenger's side, placing a flyer up to and pressing his face against the front passenger window. Just as the driver told respondent to scat, a second person approached the driver's side door and drew the taxi driver's attention that way. The respondent then opened the unlocked passenger-side door and removed a pouch of money and receipts from the front seat before running away. This court found that while the respondent exerted some authority over the taxi by opening the unlocked door, it was done so "without a showing of strength, power, or violence and without a threat to do so," and as such, was insufficient to support the respondent's conviction of vehicular invasion. *Id*. ¶ 17. In so holding, the court noted the respondent "did not seek to injure or physically struggle with" the taxi driver or "exercise constraint or compulsion over" the driver or his taxi. *Id.*

¶ 28    As set forth, the opposite is true in this case. Although the facts are strikingly similar to *Thomas T.*, the distinguishing factor here is that defendant *did* initiate a struggle and exercise of constraint over Moncada and her vehicle sufficient to satisfy the definition of force. *Cf. People v. Hicks*, 2015 IL App (1st) 120035, ¶ 33 (noting the physical struggle between the defendant and victim was sufficient evidence of "force" for robbery); *People v. Lewis*, 285 Ill. App. 3d 653, 656 (1996) (same). The language Moncada used - noting that she didn't "fight with [defendant] for so long" before Young took her phone - confirms this fact. Thus, defendant's assertion on appeal that Moncada "did not testify that she and [defendant] struggled or had a tug of war with the door," is patently false. That defendant's actions were also distracting does not diminish that they constituted force. In so holding, we reject defendant's attempt to always equate force with violence, as that is contrary to the case law on which we have relied. We also reject defendant's

reliance on the legislative history behind the vehicular invasion statute. Not only has this argument been rejected by case law, but we need not consult legislative history when the plain meaning of the statute is clear. See *People v. Hickman*, 163 Ill. 2d 250, 261 (1994); *Thomas T.*, 2016 IL App (1st) 161501, ¶ 16.

¶ 29    Finally, defendant maintains that even assuming force was proven, he himself never entered or reached into Moncada's vehicle, an element needed to find him guilty of vehicular invasion. Speaking of distractions, this argument's a true red herring, as it's undisputed that *Young did* reach inside the vehicle, and we have found the evidence sufficient to establish that defendant was accountable for Young's actions. Notwithstanding this point, viewing the evidence in a light most favorable to the State, it was certainly reasonable for the jury to conclude that defendant himself entered or reached into the vehicle. Moncada testified that he placed the flyer 5 inches from her face, and Bradford described defendant as having leaned into the car. Defendant confuses Moncada's testimony that he did not further reach inside the vehicle or "place his body inside the door after he opened it" for the conclusion that he *never* reached inside the vehicle or entered it.

¶ 30    Even so, a trier of fact is free to accept or reject as much or as little as it pleases of a witness' testimony. *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004). The trier of fact could have believed Moncada and Bradford's testimony that defendant reached into the vehicle even if Moncada also provided some contradictory facts. Moreover, the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Wright*, 2017 IL 119561, ¶ 70. We thus decline defendant's invitation to reweigh the evidence or overtake the

trier of fact. For the foregoing reasons, we conclude the evidence was sufficient to sustain defendant's conviction beyond a reasonable doubt.

¶ 31                                   *Jury Selection*

¶ 32    Defendant next contends the jury selection procedure impaired his right to peremptory challenges. Defendant specifically argues that the trial court failed to provide timely notice of its jury selection procedure, precluding him from adequately questioning jurors. He also maintains that because he was required to exercise his challenges contemporaneously with the State, the number of those challenges was effectively reduced. Defendant asks that we reverse and remand the case.

¶ 33    As to this issue, the following facts are relevant. During *voir dire*, the trial court called 30 potential jurors and questioned each about their background and potential biases. Potential juror Christopher Socha stated he had been a crime victim "[a] few times," most recently when someone entered his car at a light demanding money but then took off with his phone. His apartment was also broken into. Pursuant the trial court's questioning, Socha nonetheless stated he could be a fair and impartial juror in spite of being a crime victim. Potential juror Virginia Procuniar also stated that in the 1980s, she was at a stoplight in another state when someone smashed her window and grabbed her purse from the seat. She similarly stated that she nonetheless could be a fair and impartial juror.

¶ 34    After allowing the defense and State the opportunity to question the jury, the trial court then outlined how the jury would be impaneled. First, the State and defense would identify in writing, and by number and name, the jurors whom they sought to dismiss for cause and, second, those they wished to strike peremptorily. The court stated that both the State and defense would submit their lists at the same time. They would discuss cause first, but there was no "back

striking." Thus, if they struck the same potential juror, the strike would count against both parties. The court overruled defendant's objection to this process several times.

¶ 35    Following this and pursuant to the parties' requests and acquiescence, the court dismissed five jury members for cause. While the defense sought to also strike Socha and Procuniar for cause, as they had been victims of similar crimes, the court denied this request because the jurors had stated they could be fair and impartial. Additionally, the court denied defense counsel's request to question them further, noting he had that opportunity earlier and chose not to do so. The court nonetheless stated the defense could use a peremptory strike against those individuals.

¶ 36    The State then exercised four peremptory strikes and the defense exercised seven, including against Socha and Procuniar. Both parties challenged the same potential juror by the name of Denise Loggins. As a result, 10 members of the potential jurors were challenged in total. The first 12 members of the venire who remained after the peremptory strikes thus became the jury. The defense requested that each party exercise an additional peremptory strike because they had both stricken Loggins, but the court denied this request. The parties moved on to selecting alternate jurors, and the defense exercised the one additional peremptory strike available against a potential alternate. The two remaining members of the venire were then selected as alternate jurors.

¶ 37    As set forth, defendant now challenges the aforementioned jury selection and empaneling process. We first observe that the purpose of *voir dire* is to assure the selection of an impartial panel of jurors free from prejudice or bias and provide counsel an intelligent basis on which to exercise any challenges. *People v. Metcalfe*, 202 Ill. 2d 544, 552 (2002). The trial court, which has the responsibility of initiating and conducting *voir dire* examination, should always exercise its discretion in a manner consistent with those goals. *Id.*; *People v. Mabry*, 398 Ill. App. 3d 745,

754 (2010). "[T]he test for evaluating the court's exercise of discretion is whether the means used to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *People v. Peeples*, 155 Ill. 2d 422, 459 (1993).

¶ 38    When impaneling a jury after *voir dire* in criminal cases, the State and defense are to "pass upon and accept the jury in panels of four," unless the court in its discretion "directs otherwise," and alternates are passed on separately. Ill. S Ct R 434(a) (eff. Feb. 6, 2013). During this process, prospective jurors may be challenged for cause or peremptorily. *People v. Bowens*, 407 Ill. App. 3d 1094, 1098 (2011). A challenge for cause is supported by a specific reason, like bias or prejudice, which disqualifies that potential juror; such challenges are limitless and left to the discretion of the trial court. *Id*. A peremptory challenge, on the other hand, need not be supported by any reason, and Supreme Court Rule 434 (eff. Feb. 6, 2013) allows defendants in a criminal case who are facing imprisonment only seven such challenges (and the State the same). *Id*. "After the jury is impaneled and sworn the court may direct the selection of alternate jurors, who shall take the same oath as the regular jurors. Each party shall have one additional peremptory challenge for each alternate juror." Ill. S Ct R 434(e) (eff. Feb. 6, 2013).

¶ 39    Thus, Rule 434(a) expressly grants a trial court the discretion to alter the traditional procedure for empaneling juries so long as the parties have adequate notice of the system to be used and the method does not unduly restrict the use of peremptory challenges. *People v. McCormick*, 328 Ill. App. 3d 378, 382 (2002), citing *People v. Moss*, 108 Ill. 2d 270, 275 (1985). The right to peremptory challenges is one of the most important rights granted to an accused because it eliminates "extremes of partiality on both sides" and assures the parties that the case will be decided on the basis of evidence placed before the jurors. *People v. Daniels*, 172 Ill. 2d 154, 165 (1996); see also *McCormick*, 328 Ill. App. 3d at 382. Its denial or impairment is

reversible error without a showing of prejudice. *Id.* Significantly, however, the right to peremptory challenges is not denied or impaired if the procedure affords both parties a fair opportunity to detect bias or hostility and to excuse any objectionable venire member. *Daniels*, 172 Ill. 2d at 165; *McCormick*, 328 Ill. App. 3d at 382. Whether this right has been impaired depends on the specific facts of each case. See *Daniels*, 172 Ill. 2d at 166.

¶ 40    Here, rather than conducting the traditional four-by-four empaneling process, the court chose to present the parties with all 30 potential jurors and allow the State and defense to identify which members to strike, with the caveat that they could potentially strike the same juror. As set forth, Rule 434 expressly permits the trial court to use a different procedure. Defendant, however, argues the trial court abused its discretion by providing notice of this alternate process only *after* the venire was questioned. He maintains this "lack of notice" caused him to miss an opportunity to further question Socha after unsuccessfully moving to strike him for cause and to lose a peremptory strike, since both parties struck the same juror. For the reasons to follow, we find defendant's rather convoluted claim holds no water.

¶ 41    First, in support of his claim as to notice, defendant relies on *Moss*, which similarly dealt with whether a trial court's use of an alternate empaneling procedure impaired the defendant's right to peremptory challenges. In holding that there was no such impairment, *Moss* observed that the trial court expressly notified the parties of the alternate procedure before initiating *voir dire*. However, *Moss* did not hold that such notification is *required* before initiating *voir dire*, as defendant suggests, and defendant has not cited any other case in support of his claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Here, we do not believe that the trial court's practice of informing the parties about the empaneling procedure after questioning the venire limited their ability to detect juror bias or hostility, which is the key factor according to *Moss*.

¶ 42    Significantly, defense counsel had ample opportunity to question Socha during *voir dire* about his crime-victim status but chose not to do so. In fact, during *voir dire* the only question defense counsel asked jurors was whether they actually lived inside the city. Defendant has not identified how knowledge of the court's alternate empaneling procedure would have changed counsel's practices in this case. Defendant also does not argue on appeal that the trial court abused its discretion in conducting the *voir dire* or in refusing to dismiss Socha for cause. This is likely because Socha stated he could be fair and impartial in spite of his crime-victim status, and the trial court's determination in that regard certainly was not unreasonable. See *People v. Williams*, 173 Ill. 2d 48, 67 (1996), citations omitted (noting, the trial court is in "the best position to observe the potential juror's demeanor and ascertain the meaning of his or her remarks."); *People v. Becker*, 239 Ill. 2d 215, 234 (2010) (noting, a trial court abuses its discretion where its decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with it). Thus, defendant's argument that he "was forced to use peremptory strikes on jurors he sought to have dismissed for cause" is specious.

¶ 43    Second, even assuming this was error on the trial court's part, the failure to remove a juror for cause is grounds for reversal only if the defense has exercised all of its peremptory challenges and the objectionable juror was allowed to sit on the jury. *People v. Pendleton*, 279 Ill. App. 3d 669, 675 (1996). It has been held that "defendants fail to establish prejudice where they have not indicated that they were forced to accept an objectionable juror, thereby denying the trial court an opportunity to cure the alleged error." *Id*. at 676. As stated, here, defendant used his sixth peremptory challenge to strike Socha and his seventh to strike Procuniar. At no point has defendant argued he was forced to accept an objectionable juror after exhausting all his peremptory challenges. Likewise, defendant's argument that he was effectively prohibited from

using his peremptory strikes fails where he cannot show he had to accept an objectionable juror. See *Moss*, 108 Ill. 2d at 276 (rejecting the defendant's claim that his right to peremptory challenges was impaired, where there was nothing to indicate bias or prejudice on the part of the jurors). In short, defendant cannot demonstrate and does not claim that he was deprived of an impartial jury. See *id*. at 675-76; see also *McCormick*, 328 Ill. App. 3d at 383 (finding no prejudice where the trial court allowed challenges and there was no indication that the defendant was precluded from removing an objectionable venire member).

¶ 44    As the State notes, in *McCormick*, 328 Ill. App. 3d at 383, this court advised that if employing an alternative method of jury empaneling, a defendant's peremptory right will not be impaired if the court limits the size of the venire to the number of jurors required, plus the authorized number of peremptory challenges, or explains how the jury ultimately will be chosen (such as in numerical order). The court in this case did just that by limiting the venire to 30 people, which was the number of jurors and alternate jurors required (14), plus the authorized number of peremptory challenges for both jury selection and alternate jury selection (16). Further, the jurors were selected in numerical order, thus ensuring that the parties were ultimately aware of who would be on the jury. Indeed, every potential juror who was not stricken ended up serving on the jury or as an alternate. As such, defendant's right to exercise his peremptory challenges was not infringed, nor did the court abuse its discretion. Defendant's claim therefore fails.

¶ 45                    *Closing Argument*

¶ 46    Defendant next argues that the prosecutor made inaccurate and improper remarks during the State's closing argument, thereby denying him a fair trial. At the outset, we note that defendant failed to object to the issues he now raises. Objections to closing argument must be

made at trial to be preserved for review, otherwise they are defaulted. *People v. James*, 2021 IL

App (1st) 180509, ¶ 38; see also *People v. Naylor*, 229 Ill. 2d 584, 592 (2008) (both a trial

objection and a written posttrial motion raising the issue are required). Nonetheless, defendant

argues the alleged errors fall under the plain-error exception to forfeiture, which serves as a

narrow and limited exception to procedural default. See *Naylor*, 229 Ill. 2d at 593. However, the

first step of plain-error review is always determining whether any error occurred as to closing

arguments. *James*, 2021 IL App (1st) 180509, ¶ 38.

¶ 47    It is well settled that a prosecutor is allowed a great deal of latitude in closing argument

and has the right to comment upon the evidence presented and upon reasonable inferences

arising therefrom, even if such inferences are unfavorable to the defendant. *Id*. ¶ 39. The

prosecutor may also respond to comments by defense counsel that clearly invite a response.

*People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26. However, a prosecutor must refrain from

making improper, prejudicial comments and arguments. *James*, 2021 IL App (1st) 180509, ¶ 39.

Even if a prosecutor's closing remarks are improper, they do not constitute reversible error

unless they result in substantial prejudice to the defendant, such that absent those remarks the

verdict would have been different. *Id*. Whether we review this matter *de novo* or for an abuse of

discretion, the result is the same. See *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26 (noting the

standard is unclear). That is, viewing the remarks in the context of the entire closing argument,

as we must, we conclude there was no reversible error committed here. See *People v. Nicholas,*

218 Ill. 2d 104, 122 (2005).

¶ 48    Defendant specifically contends the prosecutor misstated the law of accountability and

improperly defined "force," which confused the jury and effectively "reduced the State's burden

of proof." Defendant first takes issue with the State's analogy comparing defendant's teamwork

with Young during the vehicular invasion to a basketball assist and championship. Here, the prosecutor stated at the outset that "in any team sport one person doesn't make the championship; you need a team. Michael Jordan didn't win the championship until he had Scottie Pippen. Lebron James didn't win the championship until he teamed up with Dwayne Wade, and that's what we have in this case." The prosecutor explained how defendant and Young acted as teammates in surrounding Moncada's car, opening its doors, taking the phone, and running away.

¶ 49    The State then identified all the necessary elements of vehicular invasion, and in explaining the language, " 'or for one whose conduct he is legally responsible,' " the prosecutor read the accountability instruction and law to the jury. The prosecutor drew on the basketball analogy again stating that hypothetically, if "I'm a basketball player and I have the ball and I pass it to someone and he scores, who scores there? The team scores. Not just me, not just him. The team scores. That's what we have here, Ladies and Gentlemen, so any time it says 'or for one whose conduct he's legally responsible for,' think, it can be either one of them or both of them, it doesn't matter. It's like they're one person, they're a team."

¶ 50    Defendant contends this was an improper analogy because, in closing, the State only argued specific intent accountability to the jury and not common criminal design. Defendant's argument is belied by the record and law. The record shows the State argued both forms of accountability to the jury after presenting the appropriate instruction, which largely reflects the language in the statute. See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (eff. October 28, 2016); 720 ILCS 5/5-2 (West 2018).[3] In addition, it's "long [been] recognized that the

_____

[3]We note there is only one accountability instruction available and it does not directly distinguish between specific intent and common design accountability, as defendant suggests. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

underlying intent" of the accountability statute "is to incorporate the principle of the common-design rule." See *Fernandez*, 2014 IL 115527, ¶ 13. Viewing the remarks in the context of the entire closing argument and given that prosecutors have wide latitude in closing, we conclude the basketball analogy was perfectly reasonable. See *Nicholas,* 218 Ill. 2d at 122. As set forth, defendant and Young traveled downtown with the specific intent to steal phones and, apart from that, they clearly worked in conjunction as teammates towards a common criminal enterprise of stealing the phone, making the acts of one the acts of both. See *Perez*, 189 Ill. 2d at 267.

¶ 51     Defendant's contention that the State's closing argument was misleading because defendant and Young "shared a common intent to solicit money from pedestrians downtown" is a backdoor challenge to the sufficiency of the evidence, rather than to closing argument. As such, defendant urges this court to credit his self-serving testimony that he lacked both an intent to steal the phone and a common criminal design. We have already disposed of this argument in our sufficiency of the evidence analysis. We will not reweigh the evidence or replace our judgment with that of the trier of fact. Incidentally, this argument also contradicts defendant's earlier claim, raised as part of his sufficiency challenge, that both defendant and Young "acted with a design to take the phone through distraction." Regardless, defendant's point of contention does not render the State's closing improper.

¶ 52     Moreover, defense counsel effectively dispelled any possible misunderstanding by the jury about the basketball analogy when he countered in closing, if "Dennis Rodman sucker punches somebody, you don't blame Michael Jordan and Scottie Pippen for that. Dennis Rodman did that on his own accord." The defense further argued the State had not presented "any evidence" that defendant knew "Young was going to take that phone." This was, after all,

the very essence of argument. While the State effectively argued the basketball analogy, the defense skillfully poked holes into that logic, thus reducing any potential prejudice.

¶ 53    Finally, defendant claims the State improperly responded in rebuttal to the aforementioned defense argument by stating that if defendant was not "part of the plan from the beginning," defendant should not have run after Young stole the phone. It's well established that proof that a defendant fled from the scene or maintained close ties with his companions after the crime are all factors a jury may consider in determining the defendant's legal accountability. See *Perez*, 189 Ill. 2d at 267. There was no misstatement of the law. For all these reasons, we see no error in the State's handling of accountability principles during closing argument.

¶ 54    Defendant further contends the prosecutor misstated the law on force. Defendant notes that during rebuttal, the State argued that "force" did not require violence, as defense counsel maintained. The State added, "You can forcefully open a door, you can forcefully walk through a crowd, you can forcefully do many things, and that's what the defendant did. He forcefully opened Ms. Moncada's door. This is not what his cohort did. This is what he did." Later, the State added, "So let's not be mistaken, let's not get distracted because [defendant] did himself reach into the vehicle and he did himself use force." Given the law as discussed and our analysis, this was not an incorrect representation to the jury. We further note that there is no definition of "force" in the pattern jury instruction on vehicular invasion, and defendant did not request one. See Illinois Pattern Jury Instructions, Criminal, No. 11.93 (eff. Jan. 1, 1991). Defendant's argument in that specific regard therefore fails.

¶ 55    Defendant also maintains the State improperly argued in rebuttal that Young "forcefully" stole the phone. As to Young, the prosecutor stated:

"Now Dionte Young, he used a little bit more force because he went inside, he actually put his body inside to snatch the phone from the middle of the window where it was mounted. It's not violent. He forcefully did so. He snatched, he grabbed, he took. All those things are forceful. They're synonyms for force. It does not mean violence so let's not be mistaken."

¶ 56    Given that Young did not immediately leave when directed to do so by Moncada, but instead reached into her car and took her phone, it's at least arguable that Young's actions could constitute force. They could have showed power or compulsion directed to a specific end. Regardless of whether the State's take on those facts was accurate, the State's main point was that force cannot always be equated with violence, which we have found is certainly true. Moreover, this was argument, and the jury was free to disregard the State's interpretations, as instructed by the trial court. See *James,* 2021 IL App (1st) 180509, ¶ 50 (finding that the trial court provided the jury with curative instructions, admonishing them at opening and closing that attorney arguments were not evidence and any statements not based on the evidence should be disregarded). We cannot say the remarks resulted in substantial prejudice such that the verdict would have been different absent the remarks. See *James*, 2021 IL App (1st) 180509, ¶ 39.

¶ 57     For the above-stated reasons, we find no error. However, even assuming any error, defendant cannot fulfill his burden of persuasion in establishing plain error. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). Under that doctrine, the error will only be considered where the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant *or* the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 58    After viewing the entire closing argument in context, we cannot say any claimed error was so prejudicial that it affected the integrity of the judicial process. See *Nicholas,* 218 Ill. 2d at 123; *cf. People v. Blue*, 189 Ill. 2d 99, 139-40 (2000) (ordering a new trial where the cumulative error created a pattern of prejudice and encouraged the jury to decide the case based on emotion rather than the evidence). Likewise, the evidence was not closely balanced. See *People v. Boston*, 2018 IL App (1st) 140369, ¶¶ 98, 100. The State presented confident and competent evidence from two eyewitnesses that defendant and his friend reached into or entered Moncada's vehicle by force to steal her phone and then fled the scene. Defendant and Young were both identified, and defendant was found with the phone. Defendant effectively confessed to the crime. Defendant's contrary testimony that he went downtown only to seek charitable donations, although he had no container for collecting such donations and the charitable group did not even exist, was completely implausible. *Cf. Sebby*, 2017 IL 119445, ¶ 63 (finding evidence closely balanced where each side presented plausible accounts). Defendant did not introduce any corroborative evidence. For these reasons, defendant's arguments as to the impropriety of the State's closing must fail.

¶ 59                                *Jury Question*

¶ 60    Defendant next argues that the trial court abused its discretion when addressing the jury question. Although a trial court must provide instruction when the jury poses an explicit question and also attempt to clarify any specific legal question over which there is doubt or confusion, the court may, in its discretion, refrain from doing so if the given instructions are readily understandable and sufficiently explain the relevant law. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). Furthermore, if the jury's question is ambiguous and any response to the question could require " 'a colloquy between the court and the jury, a further explanation of the facts, and

perhaps an expression of the trial court's opinion on the evidence,' the court may refuse to answer the question." *People v. Reid*, 136 Ill. 2d 27, 39-40 (1990), citing *People v. Tostado*, 92 Ill. App. 3d 837, 839 (1981).

¶ 61 Here, after deliberating about three hours, the jury sent a note asking what would happen if they couldn't reach a unanimous decision. The trial judge, without objection, told the jury to continue deliberating. Several hours later, the jury asked: "Does leaving the scene of the crime be [*sic*] considered during the commission of an offense." The judge noted this was a "verbatim" note. He then read it several times and stated it did not make much sense. The judge noted his response would be "you heard the evidence, continue to deliberate." The State did not object. Defendant did not object either, but requested "one second," and a short time later, another "brief second." The judge asked what the defense was waiting for and then stated,

"I'm not bringing them out, I'm not going to address that issue. There's Supreme Court law and there's appellate case law that I cannot direct them as to what evidence they've heard, I can't fine-tune it, I can't clarify. That would be considered reversible error. My response is you heard the evidence, continue to deliberate."

Defense counsel stated, "Understood." About an hour and twenty minutes later, the jury reached a verdict finding defendant guilty of vehicular invasion.

¶ 62 Defendant now argues the trial court failed to address the jury's confusion on the legal issue of accountability. Defendant not only failed to raise a contemporaneous or posttrial objection to the court's response, thus forfeiting the matter, he positively acquiesced to it. See *Naylor*, 229 Ill. 2d at 592 (both a trial objection and a written posttrial motion raising the issue are required to preserve a claim of error). When a defendant acquiesces in the trial court's answer to a jury question, the defendant cannot later complain that the trial court's answer was

an abuse of discretion. *Averett*, 237 Ill. 2d at 23-24. While defendant argues any objection would have fallen on "deaf ears," thus suggesting the trial court would have declined to entertain defendant's objection or contrary argument, the record simply does not support defendant's assertion.

¶ 63    However, even if the issue were properly preserved, defendant's argument would be unavailing. We first observe that defendant's reliance on *People v. Dennis*, 181 Ill. 2d 87 (1998), is misplaced. There, the defendant was accused of armed robbery via accountability, and during deliberations the jury twice asked, "When is the commission of the offense complete?" *Id*. at 92. The trial court responded, "you may consider the period of time and the activities involved in escaping to a place of safety." *Id.*  The supreme court in *Dennis* held the instruction was erroneous because escape is not an element of armed robbery for which a defendant may be held accountable. The court in *Dennis* wrote, "[a] person who forms the intent to facilitate an escape only after the forceful taking of property has occurred can neither aid nor facilitate the conduct which is an element of robbery." *Id*. at 104.

¶ 64    Unlike in *Dennis*, here, the trial court did not erroneously answer the jury's question. The jury's question was unclear, the jury had already received explicit instructions, and any further answer by the court could have potentially aided the State's case, as the trial court clearly recognized. Although flight is certainly not an element of vehicular invasion, it is a factor the jury may consider in determining the defendant's legal accountability. See *Perez*, 189 Ill. 2d at 267; *Boston*, 2018 IL App (1st) 140369, ¶ 100. Additionally, the question was asked only once, and the jury was able to proceed and reach a verdict. *People v. Williams*, 252 Ill. App. 3d 635, 645 (1993). Defendant's suggestion that the jury verdict issued as a result of its confusion over this question is purely speculative. Accordingly, the trial court's actions were not so

unreasonable or arbitrary as to constitute an abuse of discretion. Finally, even assuming any error, it was not plain error given that the evidence was not closely balanced and defendant cannot establish prejudice.

¶ 65                                    CONCLUSION

¶ 66    For all the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 67    Affirmed.